Slip Op. 08-95

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
:
NSK CORPORATION, *et al.*,                    :
:
                    Plaintiffs,              :
:
        and                                  :
:
FAG ITALIA SpA, *et al.*,                     :
:
                    Plaintiff-Intervenors,   :
:                   Before: Judith M. Barzilay, Judge
        v.                                   :   Consol. Court No. 06-00334
:                   **Public Version**
UNITED STATES,                               :
:
                    Defendant,               :
:
        and                                  :
:
THE TIMKEN COMPANY,                          :
:
                    Defendant-Intervenor.    :
_____:

OPINION

[Plaintiffs' motion for judgment on the agency record is granted in part and denied in part.]

Dated: September 9, 2008

*Crowell & Moring, LLP*, (*Matthew P. Jaffe*), *Robert A. Lipstein*, *Alexander H. Schaefer*, and *Sobia Haque*; *Sidley Austin, LLP*, *Neil R. Ellis* and *Jill Caiazzo* for Plaintiffs.

*Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP*, (*Max F. Schutzman*), *Adam M. Dambrov*, and *William F. Marshall*; *Steptoe & Johnson, LLP*, *Herbert C. Shelley*, *Alice A. Kipel*, and *Susan R. Gihring* for Plaintiff-Intervenors.

*Gregory  G. Katsas*, Assistant Attorney General; (*Claudia Burke*), Commercial Litigation Branch, Civil Division, United States Department of Justice; (*Mark B. Rees*), *David A.J. Goldfine*, *James M. Lyons*, and *Neal J. Reynolds*, Office of the General Counsel, United States International Trade Commission for Defendant, United States.

*Stewart and Stewart*, (*Eric P. Salonen*), *Geert De Prest*, *Elizabeth A. Argenti*, and *Terence P. Stewart* for Defendant-Intervenor.

**BARZILAY, JUDGE**:  Plaintiffs NSK Corporation, NSK Ltd., and NSK Europe Ltd. (collectively, "NSK"), and JTEKT Corporation and Koyo Corporation of U.S.A. (collectively, "JTEKT"), move pursuant to USCIT Rule 56.2 for judgment on the agency record, requesting that the court remand certain determinations included in the final results of the United States International Trade Commission's ("ITC" or "Commission") second sunset review covering ball bearings from China, France, Germany, Italy, Japan, Singapore, and the United Kingdom.  *See Certain Bearings From China, France, Germany, Italy, Japan, Singapore, and the United Kingdom; Investigation Nos. 731-TA-344, 391-A, 392-A and C, 393-A, 394-A, 396 and 399-A (Second Review)*, 71 Fed. Reg. 51,850 (ITC Aug. 31, 2006) ("*Final Results*").  Representing both foreign and domestic producers of ball bearings, Plaintiffs challenge the ITC's decision to continue antidumping duties on subject imports from Japan and the United Kingdom.[1]  Pl. Joint Br. 1-2.  The ITC concluded that revocation of the underlying orders would likely lead to a continuation or recurrence of material injury to domestic industry within a reasonably foreseeable time.[2]  *See Final Results*, 71 Fed. Reg. 51,850; 19 U.S.C. §§ 1675(c) & 1675a(a).  The court has

---

[1] Though limited to seeking relief on orders covering ball bearings from the United Kingdom, Plaintiff-Intervenors Schaeffler KG, The Barden Corporation (U.K.) Ltd., FAG Italia S.p.A., Schaeffler Group USA, Inc., and The Barden Corporation (collectively, "Schaeffler Group"), join as a matter of right pursuant to USCIT Rule 24.  *See* USCIT R. 24(a) & (c); *see also NSK Corp. v. United States*, Slip Op. 08-21, 2008 WL 465809, at *6 (Feb. 15, 2008).  Defendant-Intervenor The Timken Company ("Timken"), also joins this proceeding as a matter of right pursuant to USCIT Rule 24.

[2] For a full explanation of the ITC's reasoning, see *Certain Bearings from China, France, Germany, Italy, Japan, Singapore, and the United Kingdom; Investigation Nos. 731-TA-344, 391-A, 392-A and C, 393-A, 394-A, 396 and 399-A (Second Review)*, USITC Pub. 3876 (Aug. 2006) ("*Staff Report*"), public version *available at* http://hotdocs.usitc.gov/docs/pubs/701_731/pub3876.pdf.

jurisdiction over actions challenging the final results of a sunset review pursuant to 28 U.S.C. §

1581(c).  *See* § 1581(c) & 19 U.S.C. § 1516a.  For the reasons stated herein, Plaintiffs' motion is

granted in part and denied in part.

## I. BACKGROUND

For the past twenty years, NSK and JTEKT have been subject to antidumping duties on

imported ball bearings from Japan and the United Kingdom.  *See Antidumping Duty Orders: Ball

Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof From

the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand,

and the United Kingdom*, 54 Fed. Reg. 20,900-911 (Dep't Commerce May 15, 1989) ("*AD

Orders*").  NSK Corporation is a U.S. company that produces ball bearings domestically and

imports these products from its sister companies, NSK Ltd., a Japanese corporation, and NSK

Europe Ltd., a British corporation.[3]  JTEKT Corporation is a Japanese manufacturer and exporter

of ball bearings, and Koyo Corporation of U.S.A. is a domestic importer of such products.[4]

In 1999, the ITC initiated the first set of sunset reviews under § 1675(c) and ultimately

determined that revocation of the *AD Orders* would likely lead to material injury of the domestic

industry.  *See Continuation of Antidumping Duty Orders: Certain Bearings From France,

Germany, Italy, Japan, Singapore, the United Kingdom, and the People's Republic of China*, 65

Fed. Reg. 42,665 (Dep't Commerce July 11, 2000).  On June 1, 2005, the ITC automatically

---

[3] NSK Ltd. is a party to the above captioned case, while NSK Europe Ltd. is a party to
Court No. 06-0036, which has been consolidated with this case pursuant to USCIT Rule 42(a).
*See* USCIT R. 42(a).

[4] Both JTEKT Corporation and Koyo Corporation of U.S.A. are parties to Court No. 06-
00335, which has also been consolidated with this case.  *See* USCIT R. 42(a).

initiated a second sunset review of the *AD Orders*. *See Certain Bearings From China, France,*

*Germany, Italy, Japan, Singapore, and the United Kingdom*, 70 Fed. Reg. 31,531 (ITC June 1,

2005); § 1675(c). After finding sufficient participation among interested parties, the ITC

commenced a full sunset review in accordance with § 1675(c)(5). *See Certain Bearings From*

*China, France, Germany, Italy, Japan, Singapore, and the United Kingdom*, 70 Fed. Reg. 54,568

(ITC Sept. 15, 2005). Approximately one year later, the ITC concluded that revocation of the *AD*

*Orders* would likely lead to a continuation or recurrence of material injury to the domestic

industry. *See Final Results*, 71 Fed. Reg. 51,850. NSK and JTEKT now challenge the *Final*

*Results* of the second sunset review pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii). NSK Compl. ¶¶8-23; NSK and NSK Europe

Ltd. Compl. ¶¶8-28; JTEKT Compl. ¶¶12-31.

## II. STANDARD OF REVIEW

The Court will uphold the ITC's determination unless it is "unsupported by substantial

evidence on the record, or otherwise not in accordance with law." § 1516a(b)(1)(B)(i).

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v.*

*NLRB*, 305 U.S. 197, 217 (1938). In a material injury determination, the ITC should take "into

account the entire record, including whatever fairly detracts from the substantiality of the

evidence." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984). However,

the fact that plaintiffs "can point to evidence of record which detracts from the evidence which

supports the Commission's decision and can hypothesize a reasonable basis for a contrary

determination is neither surprising nor persuasive." *Matsushita Elec. Indus. Co., Ltd. v. United*

*States*, 750 F.2d 927, 936 (Fed. Cir. 1984). "[T]he possibility of drawing two inconsistent

conclusions from the evidence does not prevent an administrative agency's finding from being

supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

When "the totality of the evidence does not illuminate a black-and-white answer," it is the role of

the ITC as the "expert factfinder" to decide which side is most likely accurate. *Nippon Steel

Corp. v. United States*, 458 F.3d 1345, 1359 (Fed. Cir. 2006). Therefore, the court will not

"displace" an agency's "choice between two fairly conflicting views, even though the court

would justifiably have made a different choice had the matter been before it de novo." *Universal

Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

Factual determinations of the ITC are "presumed to be correct," and "[t]he burden of

proving otherwise shall rest upon the party challenging such decision" in this Court. 28 U.S.C.

§ 2639(a)(1). Furthermore, "[t]he ITC is not required to explicitly address every piece of

evidence presented by the parties, and absent a showing to the contrary, the ITC is presumed to

have considered all of the evidence on the record." *Nucor Corp. v. United States*, 28 CIT 188,

234, 318 F. Supp. 2d 1207, 1247 (2004) (quotations & citation omitted), *aff'd*, 414 F.3d 1331

(Fed. Cir. 2005). "A court may uphold [an agency's] decision of less than ideal clarity if the

agency's path may reasonably be discerned." *Ceramica Regiomontana, S.A. v. United States*,

810 F.2d 1137, 1139 (Fed. Cir. 1987) (brackets in original) (quotations & citations omitted).

Nevertheless, the ITC "must assess, based on currently available evidence and on logical

assumptions and extrapolations flowing from that evidence, the likely effect of revocation of the

antidumping order on the behavior of the importers." *Matsushita Elec. Indus. Co.*, 750 F.2d at

933.

## III. DISCUSSION

Congress requires Commerce and the ITC to conduct sunset reviews every five years after the initial publication of an antidumping order. *See* § 1675(c). In a sunset review proceeding, Commerce must revoke an antidumping order unless it determines "that dumping . . . would be likely to continue or recur," and the ITC determines that material injury to the domestic industry "would be likely to continue or recur." § 1675(d)(2). In making its determination, the ITC must "consider the likely volume, price effect, and impact of imports of the subject merchandise on the [domestic] industry if the order is revoked . . . ." § 1675a(a)(1). Specifically, it must take into account

> (A) its prior injury determinations, including the volume, price effect, and impact of imports of the subject merchandise on the industry before the order was issued,
> (B) whether any improvement in the state of the industry is related to the order,
> (C) whether the industry is vulnerable to material injury if the order is revoked, and
> (D) in an antidumping proceeding under section 1675(c) of this title, the findings of the administering authority regarding duty absorption under section 1675(a)(4) of this title.

*Id*. While the ITC must consider all of the factors enumerated in the statute, no one factor is necessarily dispositive.

> The presence or absence of any factor which the Commission is required to consider under [§ 1675a(a)] shall not necessarily give decisive guidance with respect to the Commission's determination of whether material injury is likely[5] to continue or recur within a reasonably foreseeable time[6] if the order is revoked

---

[5] The term "likely" typically means "'probable,' not merely 'possible.'" *Usinor v. United States*, 26 CIT 767, 794 (2002) (not reported in F. Supp.) (citation omitted).

[6] The term "'reasonably foreseeable time' will vary from case-to-case, but normally will exceed the 'imminent' timeframe application in a threat of injury analysis." Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Rep. No. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4211 ("SAA").

. . . . In making that determination, the Commission shall consider that the effects of revocation or termination may not be imminent, but may manifest themselves only over a longer period of time.

§ 1675a(a)(5).

## A. Application of *Bratsk* to Sunset Reviews Generally

Because non-subject imports[7] have secured a significant share of the U.S. ball bearing market during the second review, Plaintiffs urge the court to apply the holding in *Bratsk Aluminum Smelter v. United States*, 444 F.3d 1369 (Fed. Cir. 2006) ("*Bratsk*"), to sunset reviews. In *Bratsk*, the Federal Circuit held that

> [w]here commodity products are at issue and fairly traded, price competitive, non-subject imports are in the market, the Commission must explain why the elimination of subject imports would benefit the domestic industry instead of resulting in the non-subject imports' replacement of the subject imports' market share without any beneficial impact on domestic producers.

*Bratsk*, 132 F.3d at 1373. This court must therefore first examine whether *Bratsk* reaches beyond injury investigations and affirmatively requires the ITC to analyze, in the course of conducting a sunset review, whether non-subject imports have replaced or are likely to replace subject imports in the domestic market to such an extent that removal of the order would be unlikely to lead to continuation or recurrence of material injury by reason of subject imports.[8]  *See* § 1675a(a)(1).

---

[7] Pursuant to the *Staff Report*, "the term nonsubject is used to refer to all countries currently not subject to the antidumping duty orders on [ball bearings] (i.e., countries other than France, Germany, Italy, Japan, Singapore, and the United Kingdom) and the term subject is used to refer to France, Germany, Italy, Japan, Singapore, and the United Kingdom."  *Staff Report* at BB-I-2 n.3.

[8] This is related to, but distinguishable from the "replacement-benefit" test applied in the context of an investigation.  Whether the underlying order has benefitted the domestic industry has little significance in a sunset review, where the critical inquiry concerns whether removing the underlying order—despite having limited effectiveness during the review period—will likely lead to a continuation or recurrence of material injury as a result of unfairly traded subject

Once the court analyzes whether *Bratsk* should generally apply in sunset reviews, it will consider

the specific conditions set out by the Federal Circuit and whether they apply in this case.

Plaintiffs contend that under these facts the ITC must consider the impact of non-subject

imports in the context of a sunset review because it is a necessary step in establishing likely

injury. *See* § 1675a(a)(1). In response, Defendant argues that the additional analysis outlined in

*Bratsk* is limited to injury investigations and carries a rigid "replacement-benefit" test that is

inconsistent with the multifaceted sunset review analysis outlined in § 1675a(a)(1)-(5). *See*

*Bratsk*, 444 F.3d at 1374-75; § 1675a(a)(1)-(5); Def. Resp. Br. 40-44. Defendant further claims

that "there is a fundamental analytical difference between the Commission's analysis in an

original injury investigation and a sunset review" which precludes application of *Bratsk* to the

latter. Def. Resp. Br. 42; Oral Argument Tr. 35-39.

At the outset, the court must determine whether there is an element of "causation"

included in the statute governing sunset reviews before entertaining the possible application of

*Bratsk* to the case at bar. In relevant part, § 1675a(a)(1) provides:

> In a [sunset] review . . ., the Commission shall determine whether revocation of an
> order, or termination of a suspended investigation, *would be likely to lead to*
> *continuation or recurrence of material injury* within a reasonably foreseeable
> time. The Commission shall consider the likely volume, price effect, and *impact*
> *of imports of the subject merchandise on the industry* if the order is revoked or the
> suspended investigation is terminated.

§ 1675a(a)(1) (emphasis added). The court reads the last sentence of the statute, especially the

language emphasized, to require an inquiry that considers whether subject imports will likely

*cause* material injury to the domestic industry after the order has been revoked. This is logically

---

imports. *See* § 1675a(a)(1).

implied by the mandate that the order be revoked unless dumping and material injury would be

likely to recur. *See* § 1675(d)(2). In an injury *investigation*, 19 U.S.C. § 1673d(b)(1) requires the

ITC to establish injury to the domestic industry "*by reason of imports* . . . of the [subject]

merchandise. . . ." § 1673d(b)(1) (emphasis added). The "by reason of" language in

§ 1673d(b)(1) explicitly places an obligation on the ITC to demonstrate that the subject imports

are *causing* material injury or a threat thereof to the domestic industry. *See, e.g.*, *Gerald Metals,*

*Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) ("[T]he anti-dumping statute mandates a

showing of causal . . . connection between the [less than fair value] goods and the material

injury."). Though § 1675a(a)(1) lacks the explicit causal language mentioned above, the ITC

must nevertheless consider the same three factors of volume, price, and impact, to establish

injury in the context of an investigation, that are required to establish whether revocation of an

antidumping order would likely lead to a continuation or recurrence of material injury in a sunset

review. *See* §§ 1677(7)(B)(i) &1675a(a)(1); *see also Gerald Metals, Inc.*, 132 F.3d at 719. This

demonstrates significant overlap in the statutory considerations that guide the ITC's evaluation of

material injury in an investigation and likelihood of material injury in a sunset review. As the

criteria for establishing injury are essentially the same under each regime, the court holds that

§ 1675a(a)(1) sufficiently expresses a requirement that the ITC evaluate whether removal of the

antidumping order would likely result in material injury caused by or tied to subject imports. *Cf.*

*Neenah Foundry Co. v. United States*, 25 CIT 702, 710, 155 F. Supp. 2d 766, 773 (2001). In

other words, there is an implied element of causation under § 1675a(a)(1).[9]

_____

[9] The court recognizes that "likely" and "by reason of" are not identical standards, *see,*
*e.g.*, *Wieland-Werke AG v. United States*, 31 CIT __, __, 525 F. Supp. 2d 1353, 1361-64 (2007),
but nonetheless finds that some degree of causation is required in a sunset analysis. Because the

Assessing the likelihood of material injury in the context of a sunset review is different from establishing injury during an investigation. In the former, the ITC must engage in an analysis that is prospective, focusing on "the likely impact in the reasonable foreseeable future of an important change in the status quo—the revocation of an order or termination of a suspended investigation and the elimination of its restraining effects on volumes and prices of imports." SAA at 4209; *see also Neenah Foundry Co.*, 25 CIT at 709, 155 F. Supp. 2d at 772. By comparison, in an injury investigation "the Commission determines whether there is *current* material injury by reason of imports of subject merchandise," or alternatively under "the threat of material injury standard, the Commission decides whether injury is *imminent*, given the status quo." SAA at 4209 (emphasis added). Defendant makes much of this distinction and claims that it operates to preclude application of *Bratsk* to sunset reviews. Def. Resp. Br. 42-43.

In spite of the prospective nature of a likelihood analysis under § 1675a(a)(1), the court finds that the basic principle of *Bratsk* applies to sunset reviews and therefore it is clear that "causation is not shown" if the subject imports are unlikely to lead to a continuation or recurrence of material injury after elimination of the orders. *Id.* at 1373. Because sunset reviews involve analyzing massive amounts of data collected on past industry conditions, the ITC should be able to determine with greater certainty than in an investigation whether non-subject imports have replaced or are likely to replace subject imports in the U.S. market.[10] Moreover, application

_____

Federal Circuit has required an analysis of non-subject imports in investigations when certain conditions apply, it follows logically that the same analysis of such imports should be conducted in a sunset review if the same conditions as were present in *Bratsk* are present in the case at bar.

[10] There is some concern within the trade community as to whether *Bratsk* is a workable rule considering the difficult task assigned to the ITC of obtaining reliable information regarding imports from non-subject countries. While some of these practical issues may limit the

of *Bratsk* to sunset review causation analysis would compel the ITC to address significant

increases in market share by non-subject imports and thereby examine the effectiveness of the

underlying antidumping order in relation to fundamental changes in the marketplace that might

be more likely to cause injury to the domestic industry than unrestrained subject imports. *See*

SAA at 4210. The court views this analysis as a necessary step in establishing causation under

§ 1675a(a)(1). To hold otherwise would permit the ITC to ignore a significant factor affecting

the domestic industry when conducting a sunset review. Contrary to Defendant's position,

applying *Bratsk* to sunset reviews will not require the ITC to adopt a rigid "benefit" analysis or

sacrifice discretion in determining the likelihood of material injury under § 1675a(a). *See*

§ 1675a(a)(5); Def. Resp. Br. 43. Rather, "whenever [a sunset review] is centered on a

commodity product, and price competitive non-subject imports are a significant factor in the

market," the ITC must consider whether non-subject imports have captured or are likely to

capture market share previously held by the subject imports, and whether this level of

displacement makes it unlikely that removal of the orders will lead to a continuation or

recurrence of material injury as a result of subject imports. *Bratsk*, 444 F.3d at 1375; *see*

*Caribbean Ispat Ltd. v. United States*, 450 F.3d 1336, 1341 (Fed. Cir. 2006); *cf. Nevinnomysskiy*

*Azot v. United States*, Slip Op. 07-130, 2007 WL 2563571, at *14 (Aug. 28, 2007) (not reported

---

effectiveness of *Bratsk* in the context of an investigation, the Court is without discretion to
question the wisdom of that decision. *See Tropicana Prods., Inc. v. United States*, Slip Op. 07-
141, 2007 WL 2717874, at *5 & n.10 (Sept. 19, 2007) (not reported in F. Supp.). *Bratsk*
represents binding authority and because of the nearly identical requirements for establishing
causation under §§ 1675a(a)(1), 1677(7)(B)(i), and 1673d(b)(1), this court need only decide
whether *Bratsk* applies to sunset reviews. Nevertheless, in the context of a sunset review, the
court believes that the relative difficulty in obtaining reliable data from non-subject countries will
be reduced with the benefit of industry statistics compiled over the review period.

in F. Supp.) (citing *Bratsk* in likely price effects analysis under § 1675a(a)(3)).  In such cases, the ITC would be obligated to explain why continuation of the order is warranted given that non-subject imports have replaced or are likely to replace subject imports as the overriding cause of material injury to the domestic industry.[11]

### 1. *Application of Bratsk*

To trigger the *Bratsk* analysis, the court must determine (1) whether the subject ball bearings constitute a "commodity product" for purposes of determining substitutability and (2) whether non-subject imports are a significant factor in the U.S. market.  *See Bratsk*, 444 F.3d at 1375.  In *Bratsk*, the Federal Circuit defined "commodity product" as "generally interchangeable regardless of its source," *id*. at 1371, and subsequent cases have found a "high level of fungibility between subject imports" sufficient to trigger *Bratsk*.  *Caribbean Ispat Ltd.*, 450 F.3d at 1341.[12]  Thus, the court views the cases interpreting the term "commodity product" under *Bratsk* as requiring less than complete fungibility.  *See id.*  Here, the ITC stated that "[t]he record indicates that the vast majority of purchasers consider [ball bearings] produced in France, Germany, Italy,

---

[11] It is worth noting that the dissent in *Bratsk* was not based on any disagreement with the requirement to analyze the effect of non-subject imports during an injury determination.  Indeed, it cited several instances where the ITC had discussed them in the investigation at issue in *Bratsk*.  Therefore, the dissent concluded that the ITC had fulfilled its duty to explain "why the subject imports caused material injury to the domestic industry despite the existence of interchangeable non-subject imports."  *Bratsk*, 444 F.3d at 1378.  Although the ITC does in fact briefly address non-subject imports in the *Confidential Views* here, all of the discussion on the issue occurs in a single footnote.  *See Confidential Views* ("*CV*") at 71 n.382.  This decision requires the ITC to provide a more expansive explanation as to why continuation of the underlying order is justified in light of significant increases in non-subject imports.

[12] The specific issue in *Caribbean Ispat* concerned whether a provision in the Caribbean Basin Economic Recovery Act required the Commission to make a specific causation determination regarding imports solely from Trinidad and Tobago.  *See Caribbean Ispat Ltd.*, 450 F.3d at 1337-38.

Japan, and the United Kingdom to be substitutable for domestically produced [ball bearings]."
*CV* at 49; *see id.* at 58. It noted that "70 out of 77 responding purchasers and 81 out of
125 responding importers considered domestically produced [ball bearings] and the subject
merchandise to be 'always' or 'frequently' interchangeable." *Id.* at 58-59. Pursuant to the
responses mentioned above, the court holds that the subject ball bearings are sufficiently fungible
to satisfy the "commodity product" test under *Bratsk*.[13] *See Bratsk*, 444 F.3d at 1375.

　　　Regarding the second triggering factor, the court must examine whether non-subject
imports represent a significant factor in the U.S. market. *Id.* There is no question that non-
subject imports have a presence in the U.S. market; however, there is some doubt as to the level
of significance the court should place on their share of the market. Pursuant to the *Confidential
Views*,

> [t]he percentage of apparent U.S. consumption supplied by the domestic [ball
> bearing] industry declined irregularly during the period of review. The domestic
> industry's share of apparent U.S. consumption, in value terms, dropped from
> 67.5 percent in 2000 to 63.2 percent in 2005. The market share of
> cumulated subject imports increased slightly overall during the period of review
> from 12.9[14] percent in 2000 to 13.2 percent in 2005. The market share of
> nonsubject imports increased each year of the period of investigation, from
> 18.4 percent in 2000 to 23.6 percent in 2005.

*CV* at 58 (footnotes omitted); *see Staff Report* at BB-I-66. By quantity, the domestic industry's
market share of U.S. consumption declined by 8.5 percent, cumulated subject imports lost

---

[13] The court defers to the ITC in its decision to dismiss the purported differences between
custom and standard bearings. The only comparison for purposes of *Bratsk* is between subject
and non-subject imports and the domestic like product. *See* discussion *infra* Part C(1)(iii).

[14] Table C-2 reflects a different subtotal for U.S. consumption of cumulated subject
imports in the year 2000–14.1 percent. Consequently, cumulated subject imports would have
decreased over the review period. *See Staff Report* at C-4 Table C-2.

6.7 percent, while non-subject imports gained 15.2 percent over the review period. *See*

*Staff Report* at C-4 Table C-2. In *Bratsk*, the court observed that "[a]s a percentage of total

imports (by quantity), non-subject imports accounted for approximately 79.6% in 1999, 82.6% in

2000, and 73.0% in 2001," which satisfied the threshold test mentioned above. *Bratsk*, 444 F.3d

at 1375. Similarly, non-subject imports of ball bearings (by quantity) accounted for 63.5

percent in 2003, 68.7 percent in 2004, and 70.3 percent in 2005. *See Staff Report* at C-4

Table C-2. Relying on the apparent surge in non-subject imports and reasoning in *Bratsk*, the

court concludes that non-subject imports are a significant factor in the domestic industry. *See id.*,

BB-II-10. The criteria necessary to trigger *Bratsk* having been met, the court remands this issue

to the ITC for a full review of the impact of non-subject imports on the domestic industry in

conformity with this opinion.

## B. Cumulation of Subject Import from the United Kingdom

> The Commission
>
> may cumulatively assess the volume and effect of imports of the subject
> merchandise from all countries with respect to which reviews under section
> 1675(b) or (c) of this title were initiated on the same day, if such imports would
> be likely to compete with each other and with domestic like products in the U.S.
> market. The Commission shall not cumulatively assess the volume and effects of
> imports of the subject merchandise in a case in which it determines that such
> imports are *likely to have no discernible adverse impact* on the domestic industry.

§ 1675a(a)(7) (emphasis added). As to the last prong, "the first question is whether the imports

are likely to have any [discernible] impact. If not, the ITC is precluded from cumulating. If yes,

then the question remains whether that impact is also adverse. If affirmative, the agency is

permitted to cumulate; if negative, cumulation is not permissible since any impact is not both

discernible and adverse." *Neenah Foundry Co.*, 25 CIT at 712-13, 155 F. Supp. 2d at 775. The

"'discernible impact standard is relatively easy for the ITC to satisfy. . . . Nevertheless, a

reasonable finding of likely discernible adverse impact requires that the ITC establish that it is

likely that [the producer] could obtain a discernible amount of [the product in question] from

somewhere--such as by exploiting excess capacity, by shifting from domestic and internal

production, or by shifting from other export markets--and would have some incentive to sell a

discernible amount into the U.S. market.'" *Wieland-Werke AG*, 31 CIT at __, 525 F. Supp. 2d at

1364 (quoting *Cogne Acciai Speciali S.p.A. v. United States*, Slip Op. 05-122, 2005 WL

2217426, at *4 (Sept. 12, 2005) (not reported in F. Supp.)).  Although "[n]o statutory provision

enumerates the factors to be considered by the ITC in making the discernible adverse impact

determination," *id.* (quotations and citation omitted), the ITC "generally considers the likely

volume of the subject imports and the likely impact of those imports on the domestic industry

within a reasonably foreseeable time if the orders are revoked." *CV* at 35.

     The ITC cumulatively assessed subject imports from the United Kingdom based on "the

conditions of competition in the U.S. [ball bearing] market, the consistent volume of exports

from the United Kingdom to the United States under the order's discipline, notwithstanding the

industry's reported declines in capacity, the size of the U.K. industry and available capacity, and

the export orientation of the U.K. industry . . . ." *Id*. at 48.  It concluded that "imports from the

United Kingdom would not be likely to have no discernible adverse impact on the domestic

industry if the order was revoked." *Id*.  During the second review, subject imports from the

United Kingdom declined in value from $11.8 million in 2000 to $11.3 million in 2005.

They maintained a 0.3 to 0.4 percent share of U.S. consumption during the second review

and their share of total U.S. imports of ball bearings was at or just above 1.0 percent.  *See id*.

at 47.  Production capacity dropped sharply during the review period, falling [[      ]] percent

between 2001 and 2005, while capacity utilization increased from between [[    ]] to [[    ]]

percent in the early part of the review to [[    ]] percent to [[    ]] at the end of the review.  *Id*.

This "drop-off in capacity and production is [[

    ]]."  *Staff Report* at BB-IV-39.  The firm indicated that "it '[[


    ]].'"  *Id*.  The ball bearing industry in the

United Kingdom is export oriented, with exports accounting for [[      ]] percent    of all

shipments in the beginning of the review period to [[    ]] percent at the end.  *See CV* at 47-   48.

Although U.K. producers export [[        ]] to countries within the European Union ("EU"),

exports to the United States have remained constant at [[    ]] to [[    ]] percent of all shipments.

*Id*. at 48.  The United Kingdom is the [[      ]] largest exporter of ball bearings in the world, with

total exports of subject ball bearings increasing from [[          ]] in 2000 to [[

    ]] in 2005.  *Id*.

 In disputing the ITC's decision to cumulate subject imports from the United Kingdom,

Plaintiffs argue that: (1) the apparent consistency in volume of subject imports from the United

Kingdom over the review period is misleading because of the simultaneous decline in quantity of

subject imports and rapid rise in unit prices; (2) the higher unit values of the subject imports from

the United Kingdom demonstrate that those ball bearings are geared toward a different segment

of the market than the domestic like product; (3) the size of the U.K.'s ball bearing industry,

excess production capacity, and capacity utilization, all suggest that there is no likelihood of

discernible adverse impact; (4) although the United Kingdom is export oriented, [[        ]]

of its exports are shipped to EU countries; and (5) there is no reasonable overlap of ball bearings

produced in the United Kingdom and the domestic like product.  Pl. Joint Br. 45-56.

### 1. Reasonable Overlap of Competition

The ITC considers the following four factors to assess whether subject imports are likely

to have a reasonable competitive overlap with the domestic like product: "(1) the degree of

fungibility between products; (2) the presence of sales or offers to sell in the same geographic

markets; (3) the existence of common or similar channels of distribution; and (4) the

simultaneous presence of imports in the market." *Wieland-Werke AG v. United States*, 13 CIT

561, 563, 718 F. Supp. 50, 52 (1989).  The ITC held that subject imports from the United

Kingdom satisfied these factors.  *See CV* at 48-52.

Plaintiffs argue that subject imports are not substitutable because of a substantial

difference in the average unit values of ball bearings from the United Kingdom in relation to the

domestic like product.  *See Staff Report* BB-IV-9.  However, the record demonstrates that the

inflated average unit values Plaintiffs rely upon include the value of ball bearing *parts*, in

addition to completed bearings, which results in a higher average price when divided by the

quantity of completed ball bearings.  *See id.* at BB-IV-3 Table BB-IV-1, C-4 Table C-2; Pl. Joint

Br. 47 & n.13; Def.-Int. Resp. Br. 36 & n.14.  Pursuant to Tables BB-IV-1 and C-2, the average

unit values of subject bearings from the United Kingdom over the period of review were

$2.32 in 2000, $4.87 in 2002, $4.08 in 2004, and $4.28 in 2005, well within the

range of values for subject bearings from other countries.  *See Staff Report* at BB-IV-3 Table-IV-

1, C-4 Table C-2.  What is more, 11 of 14 purchasers reported that U.K. imports were

"always" or "frequently" interchangeable with the domestic like product, and 29 of 32

purchasers reported that U.K. bearing imports were "always" or "frequently" interchangeable

with subject imports from France, Germany, Italy, and Japan. *See CV* at 49; *Staff Report* at BB-

II-31 Table BB-II-4. Plaintiffs also contend that the vast majority of respondents had no

familiarity with the characteristics of ball bearings from the United Kingdom and therefore had

no basis for their reported opinions. Pl. Joint Br. 53-54. The court rejects this argument and will

not second guess whether the ITC properly considered the credibility of those respondents who

provided information on imports from the United Kingdom. As the principal fact-finder, the ITC

is afforded considerable discretion in evaluating information obtained from questionnaires and in

this instance the court will accept those findings. *See* § 2639(a)(1); *Noviant OY v. United States*,

30 CIT __, __, 451 F. Supp.2d 1367, 1381 (2006). Hence, the ITC's determination with respect

to reasonable competitive overlap is affirmed.

### 2. Discernible Adverse Impact

To assess whether imports from the United Kingdom are likely to have a discernible

adverse impact on the domestic industry, the court must first address whether the ITC's

determination regarding likely volume is supported by substantial evidence. Relying on value

measures, the ITC found that producers from the United Kingdom have maintained a significant

share of the U.S. market, increased their dependence on exports toward the end of the review

period, demonstrated the ability to quickly shift exports to various foreign markets, and have well

established channels of distribution to exploit export opportunities in the United States. *See CV*

at 47-48; Def. Resp. Br. 49-50. Despite large reductions in production capacity and almost

complete capacity utilization, the ITC concluded that U.K. producers could direct a discernible

level of subject bearings to the U.S. market.

The court is aware that the contemporaneous rise in value and decline in quantity of

subject imports operated to offset certain measures of market share.  In this review, the number

of subject imports from the United Kingdom dropped substantially, while the value of those

imports have remained comparatively steady as unit values increased.  *See Staff Report* at C-4

Table C-2.  Due to the wide variety of ball bearings subject to this review, the ITC prefers value

measures when examining issues related to volume, *see CV* at 38 n.191, and case law confirms

that the ITC may assign more weight to value versus quantity in administering reviews under the

antidumping statutes.  *See, e.g.*, *Am. Bearing Mfrs. Ass'n*, 28 CIT 1698, 1705, 350 F. Supp. 2d

1100, 1108-10 (2004).  Consequently, the sharp drop in the quantity of subject imports from the

United Kingdom carries little weight for purposes of this review.[15]  As subject imports from the

United Kingdom have remained steady in terms of value throughout the review period, the ITC

reasonably found that U.K. producers maintain a significant share of the U.S. market.  *See Staff

Report* at C-4 Table C-2.  The court also finds no error in the ITC's characterization of the

United Kingdom as highly export oriented based on the large percentage increase in exports over

the review period and its position as the [[              ]] exporter of ball bearings.  *See CV* at 47-

48.

Less convincing, however, are the ITC's findings that U.K. producers have discernible

levels of excess production capacity and capacity utilization, which if directed to the United

States, would have an adverse impact on the domestic industry.  During the second review,

production capacity declined from [[        ]] to [[       ]] million bearings between 2000 and

---

[15] The court notes, however, that the [[

]].  *See Staff Report* at BB-IV-39.

2005, and capacity utilization increased from [[         ]] to [[         ]] during the same period.  As

previously mentioned, the United Kingdom represents 1% of all U.S. imports and has

maintained a 0.3 or 0.4 percent share of U.S. consumption.  Although these numbers

might appear insignificant, Defendants argue that given the weakened state of the domestic

industry, even the most marginal increase in exports would likely lead to material injury.  Def.

Resp. Br. 50; Def.-Int. Resp. Br. 38.  In addition, case law confirms that the existence of non-

negligible excess capacity in relation to a non-negligible percentage of U.S. consumption

provides sufficient grounds to cumulate.  *See Cogne Acciai Speciali S.p.A.*, Slip Op. 05-122,

2005 WL 2217426, at *6-7.  At this level of excess capacity, Defendant-Intervenors claim that

[[

                                                                                                      ]].  Def.-Int. Resp. Br. 35.  This would

likely constitute a discernible level of subject imports.

     Indeed, the ITC has characterized the domestic industry as extremely vulnerable, and

though modest levels of U.K. bearings might be diverted to the U.S. market, it seems that *any*

increase in subject imports would likely have an adverse impact.  While this may in fact be true,

the ITC failed to address the significant rise in non-subject imports and large scale restructuring

within the ball bearing industry, which might have skewed its analysis of the domestic industry's

level of vulnerability and likely injury from unrestrained subject imports.  Even though the Court

has upheld the ITC's decision to cumulate imports in cases with similar facts, *see Usinor v.

United States*, 28 CIT 1107, 1127-28, 342 F. Supp. 2d 1267, 1285 (2004), this court cannot

determine, without a more complete analysis of the conditions of competition, whether this level

of available capacity would likely have an adverse impact on the domestic industry.  Therefore,

the ITC's decision to cumulate imports from the United Kingdom is remanded for additional

explanation as to whether the potential volumes of U.K. exports discussed above are likely to

have an adverse impact on the domestic industry if the order is removed.

## C. Likelihood of Continuation or Recurrence of Material Injury

### 1. Conditions of Competition

In determining "the likely impact of imports of the subject merchandise on the industry if

the order is revoked," the ITC is required to "evaluate all relevant economic factors described in

[§ 1675a(a)(4)] within the context of the business cycle and the *conditions of competition* that are

distinctive to the affected industry."  § 1675a(a)(4) (emphasis added).  Plaintiffs contend that the

ITC did not assign sufficient weight to the global restructuring taking place in the ball bearings

industry, which has disrupted certain measures of market performance in the United States that

are not necessarily signs of weakness or vulnerability.  Pl. Joint Br. 29.  Alternatively, Plaintiff-

Intervenors claim that the ITC has mischaracterized the subject imports as "interchangeable" and

therefore discounted the substantial differences between "custom" and "standard" ball bearings.

Pl.-Int. Br. 12.  In the *Confidential Views*, the ITC divided the conditions of competition into

three categories, supply, demand, and substitutability.  *See CV* at 54-61.  The court will address

each in turn.

### (i) Supply

As in the first review, the dominant producers in the U.S. industry are Delphi Automotive

Systems Corp., NSK, SKF, and Timken, accounting for [[     ]] percent of domestic production

by value.[16]  *See id.* at 56.  While maintaining operations in the United States, many domestic

producers are foreign owned, with "56.9 percent of all U.S.-produced [ball bearings] . . .

produced by foreign-owned firms" in 2005.  *Id.* at 57; *see Staff Report* at Overview-18 Table 2.

The ITC noted that

> [t]here has been some consolidation of the domestic [ball bearing] industry since
> the first reviews.  Two small [ball bearing] producers have closed their production
> facilities . . . . Some U.S. producers have relocated production lines overseas . . . ,
> closed ball bearing production plants . . . , and another domestic producer . . . has
> stopped doing business in a certain area of ball bearing production, sold part of its
> ball bearing production business, and [[
>                                         ]].  Two other domestic producers . . . have
> added U.S.-based production lines in order to produce more customized bearing
> products.

*CV* at 57.  By quantitative measures,  "domestic [ball bearing] capacity declined throughout the

period examined in these reviews, falling by 24.6 percent between 2000 and 2005, while

domestic [ball bearing] production fell steadily by 37.9 percent during the same period."  *Id*.

By value, "U.S. shipments by domestic producers decreased from $2.0 billion in 2000 to $1.7

billion in 2005."  *Id*. at 57-58.  Furthermore, "[t]he percentage of apparent U.S. consumption

supplied by the domestic [ball bearing] industry declined irregularly during the period of review,"

dropping 4.3 percent by value during the second review.  *Id.* at 58.  In sum, the ITC characterized

the supply conditions in the domestic industry as marked by widespread contraction in various

statistical measures of industry performance.  *Id*. at 69.

This description of the conditions of competition appears to understate evidence of large

---

[16] In the course of conducting the second review, the ITC identified 81 producers of ball
bearings in the United States and sent questionnaires to each firm to gather market oriented data
concerning the domestic industry.  Of the 81 producers targeted, the ITC received 23 responses.
The data contained in the *Staff Report* is comprised of information obtained from those 23
responses.  *See Staff Report* at Overview-17.

scale restructuring within the ball bearing industry that could explain much of the seemingly

negative data found in the *Staff Report*. *See Staff Report* at BB-III-1-III-4; Pl. Joint Br. 7-10, 30-

32; Pl. Joint Reply Br. 12.  In an effort to respond to evolving market conditions and reduce

production costs, several major producers have moved their production facilities for less

technical ball bearings to non-subject countries, while tailoring their U.S. production facilities to

serve specific clients located in the same geographic area, most of which require highly

customized ball bearings.  *See Staff Report* at Overview-19, 23-24, BB-III-5 n.6; Pl. Joint Br. 30-

32.  As a result of this restructuring, it seems logical that domestic production, capacity, capacity

utilization, and net sales would experience sharp declines as major ball bearing producers moved

some of their manufacturing facilities to other countries.  *See id.* at BB-III-1 & n.2.  Though

structural changes of this magnitude would undoubtedly depress certain indicators of market

performance, the ITC did not analyze these issues in its discussion of the conditions of

competition.  *See CV* at 54-61.  Whether the domestic industry is vulnerable to increased

volumes of subject imports or simply responding to other market forces is an appropriate inquiry.

The court finds that a more thorough examination of the supply conditions is warranted given the

amount of information that suggests global restructuring had the effect of depressing certain

economic measures of industry performance relied upon to cast the U.S. market as vulnerable.

    *(ii) Demand*

    Ball bearings are "used in a wide range of products and industries including automotive,

construction, manufacturing, aerospace, medical, and mining industries."  *Id*. at 54.  The market

for ball bearings is split into two segments, original equipment manufacturers ("OEMs") and

aftermarket distributors.  *See id*.  Between the two, "producers shipped 89.5 percent of their

U.S. shipments of [ball bearings] to end users/OEMs, and the remaining 10.5 percent to

distributors/aftermarket customers." *Id*.  In the first sunset reviews,

> the Commission found that demand for [ball bearings] had grown considerably
> since the original investigations, approximately doubling between 1987 and 1998,
> although it was relatively flat toward the end of the first review period.  During
> [the second review], apparent U.S. consumption of [ball bearings], measured by
> value, was 5.6 percent lower in 2005 than in 2000, although it fluctuated on an
> annual basis.  Apparent U.S. consumption of [ball bearings] decreased from
> $2.91 billion to $2.58 billion in 2001, increased slightly to $2.59 billion
> in 2004 and $2.74 billion in 2005.

*CV* at 55.  The ITC observed that demand tends to follow general economic conditions, with

growth in the ball bearings industry tracking increases in U.S. GDP.  *See id.*; *Staff Report* at BB-

II-11-II-12.  Notably, "[m]ost industry participants expect stable to increasing demand for [ball

bearings] in the near future" especially "strong near-term growth . . . in the automotive industry,

the primary user of [ball bearings], as well as in industrial markets."  *CV* at *55*; Pl. Joint Br. 11-

12.  As ball bearings are used in a variety of different industries, the ITC was unable to evaluate

demand for ball bearings in the context of a regular and measurable business cycle.  *See CV* at

55.

Plaintiffs' principal argument concerning the level of demand in the United States is that

the ITC ignored the complexities of the ball bearing market by analyzing the industry as a whole,

as opposed to dividing the industry into three market segments–Automotive OEM, Industrial

OEM, and Aftermarket.  Pl. Joint Br. 36-37; *Staff Report* at BB-II-11.  They claim that had the

ITC performed a segment specific analysis, the ITC's conclusions as to conditions of competition

with respect to demand would be much improved based on the [[    ]] financial performances of

the Industrial OEM and Aftermarket sectors.  Pl. Joint Br. 36-37.  By examining all three sectors

as a whole, the ITC overemphasized the problems within the Automotive OEM sector, which

were directly related to the poor performance of the automotive industry. This same argument is also made in the context of business cycles. Pl. Joint Br. 39.

It is well settled that the ITC bears no obligation to perform a market segmentation analysis. *See Tropicana Prods., Inc. v. United States*, 31 CIT __, __ , 484 F. Supp. 2d 1330, 1341 (2007); *Copperweld Corp. v. United States*, 12 CIT 148, 165-66, 682 F. Supp. 552, 569-70 (1988); *see also* 19 U.S.C. § 1677(4)(A). The ITC "d[oes] not err in basing its determination on data representing the experience of the domestic industry as a whole, rather than on the experience of [different segments of the industry] separately." *Tropicana Prods., Inc.*, 31 CIT at __ , 484 F. Supp. 2d at 1341; Def. Resp. Br. 38 (brackets in original). In the absence of a compelling justification for a market specific analysis, the court has no basis to overturn the ITC's findings on this issue. The automotive industry remains the largest consumer of ball bearings, and although the Industrial OEM and Aftermarket sectors outperformed the Automotive OEM, the ITC had discretion to analyze demand conditions within the domestic industry as a whole. *See* § 1677(4)(A).

*(iii) Substitutability*

The question of substitutability is of particular importance because as Plaintiff-Intervenors acknowledge "only where subject imports and domestic products are substitutable can there be a potentially adverse impact to the domestic industry" by anticipated increases in subject imports. Pl-Int. Br. 12. Based on responses to questionnaires, the ITC once again concluded that "[t]here is a significant degree of substitutability between domestically produced [ball bearings] and subject imports." *CV* at 58. Of the respondents, 70 out of 77 responding purchasers and 81 out of 125 responding importers considered domestically

produced [ball bearings] and the subject merchandise to be 'always' or 'frequently'

interchangeable.'" *Id.* at 58-59.  A minority of importers and purchasers reported that the subject

imports were not interchangeable because they did not meet certain quality standards,[17] and only

5 purchasers and 13 importers designated the subject imports as "never" interchangeable.

*Id.* at 59 n.326.

With regard to the distinctions between "standard" and "custom" bearings, the ITC found

"that there is not any clear dividing line between custom versus standard [ball bearings],"

because the terms often have different meanings depending on the individual company.  *Id.* at 60.

Apparently, customized bearings often evolve into standard bearings because large producers are

able to quickly standardize the production of custom bearings.  *See id.*  Pursuant to the ITC's

questionnaires, custom bearings have (1) a non-catalog number; (2) a specific drawing number;

(3) a customer-specific part number; or (4) have been otherwise manufactured to a customer's

specific order.  *See id.*  Standard bearings are defined as all other "off the shelf bearings."  *Id.* at

60.  By value, standard bearings represented 33.1 percent of U.S. shipments, compared to 66.9

percent for customized bearings.  *Id.* at 60 n.325.

Plaintiff-Intervenors dispute the ITC's finding with regard to the fungibility, and urge the

court to consider the "high degree of heterogeneity" that exists between custom and standard

bearings.  Pl.-Int. Br. 13.  They cite a report issued by the International Standards Organization

(ISO), noting the move away from standardized bearings and proclaim that "the trend in the

industry . . . is away from catalogue, off-the-shelf, low tech and low value products, toward more

---

[17] In this regard, 42 purchasers reported that subject ball bearings "always" or "usually"
meet minimum quality specifications while only seven purchasers reported that subject ball
bearings "sometimes" meet minimum quality specifications.  *Id.* at 59.

highly-engineered, tailor-made, high-value and specialty products." Pl.-Int. Br. 14. Alternatively, they highlight examples from the financial industry to illustrate that other industries recognize the distinction between custom-engineered versus standard bearings. Pl.-Int. Br. 14-15. To support these contentions, Plaintiff-Intervenors quote questionnaire responses from several purchasers, which reveal an emphasis on quality and customization rather than price in making purchasing decisions. Pl.-Int. Br. 16.

In spite of the alleged differences in design between custom and standard bearings, substantial evidence supports the ITC's findings with respect to substitutability. A clear majority of respondent purchasers and importers reported that subject bearings were interchangeable with the domestic like product. *See CV* at 58-59; *Staff Report* at BB-II-30-34. This data is noteworthy because the results do not support Plaintiff-Intervenors' argument regarding the lack of fungibility between custom and standard bearings. The United States has well established markets for both custom and standard bearings and one might expect the responses of respondent purchasers to reflect this distinction. *See CV* at 60, 64 n.352. Instead, those responses confirm that from an industry standpoint, subject bearings are indeed interchangeable with domestic bearings, despite having differences that in certain contexts render them either custom or standard. The ITC dismissed these differences as they relate to substitutability because the characteristics that distinguish custom versus standard bearings lack uniformity and often change during the product life cycle. In the absence of evidence fully demonstrating the heterogeneity between custom and standard bearings, the ITC's determination on this issue will not be disturbed.

### 2. Likely Volume of Subject Imports

To evaluate the likely volume of subject imports, the ITC

consider[s] whether the likely volume . . . would be significant[18] . . . either in
absolute terms or relative to production or consumption in the United States.  In
doing so, the Commission shall consider all relevant economic factors, including

> (A) any likely increase in production capacity or existing unused
> production capacity in the exporting country,
> (B) existing inventories of the subject merchandise, or likely increases in
> inventories,
> (C) the existence of barriers to the importation of such merchandise into
> countries other than the United States, and
> (D) the potential for product-shifting if production facilities in the
> foreign country, which can be used to produce the subject merchandise,
> are currently being used to produce other products.

§ 1675a(a)(2)(A)-(D).

In the *Confidential Views*, the ITC begins its analysis of likely volume by reviewing its

findings as to conditions during the first review.  At that time, subject imports had increased

despite the order, capacity utilization was high, and product shifting was difficult.  *See CV* at 61.

The ITC concluded that although increased volume was unlikely, any marginal increase in

subject imports would have caused a decline in domestic prices.  *See id.*  In the current review,

the ITC notes that "despite the orders, cumulated subject imports have maintained a growing and

significant presence in the U.S. market during the period examined in these reviews, although

possessing just slightly lower market shares than in the first reviews."  *Id.* at 62.  The ITC

estimates that imports from subject producers would sharply increase if the orders were removed

based on several factors, namely (1) increased shipments to the U.S. market despite the presence

---

18 "'Significant' is defined as 'having or likely to have influence or effect[;] deserving to
be considered[;] important, weighty, notable[.]'"  *Gerald Metals, Inc. v. United States*, 22 CIT
1009, 1013, 27 F. Supp. 2d 1351, 1355 (1998) (brackets in original) (citation omitted).

of antidumping orders; (2) well established trade relationships and distribution channels; (3) export oriented subject producers; (4) ability to shift exports quickly from one market to another; and (5) high prices associated with the U.S. market.  *See id.* at 62, 64.

Plaintiff-Intervenors argue that subject producers have actually lost market share based on quantitative measures because of restructuring that began after institution of the orders.  Pl.-Int. Br. 18.  Part of this restructuring has entailed subject producers shifting production facilities to the United States to serve U.S. clients.  Because of this capital intensive commitment to U.S. based production, Plaintiff-Intervenors suggest that removal of the orders will not trigger a swell in exports from the subject producers as such action would undermine their U.S. operations.  Pl.-Int. Br. 19-20.  They further posit that because there was no correlation between fluctuations in dumping margins and volumes of subject imports during the second review, "it is safe to assume that import volume will similarly not increase in the absence of an [o]rder."  Pl.-Int. Br. 21.  Turning to excess capacity, Plaintiff-Intervenors contend that excess capacity alone cannot support a finding of likely volume, especially when subject producers shed [[   ]] percent of their production capacity and saw the number of exports to the United States decline by [[   ]] percent during the second review.  Pl.-Int. Br. 22.  Lastly, Plaintiff-Intervenors question the ITC's characterization of the United States as an attractive market in light of the comparatively high tariffs and availability of competitive prices in other markets.  Pl.-Int. Br. 23.

As to excess capacity, the ITC's findings imply that any excess capacity will be used to export subject bearings to the United States and that any marginal increase in subject imports will likely cause material injury to the domestic industry.  Excess capacity for subject producers declined from [[               ]] ball bearings in 2000, to [[                    ]] bearings in 2005, *see*

*CV* at 65, and capacity utilization increased from [[     ]] percent to [[     ]] percent during the

second review.  *See* Pl.-Int. App. Ex. 11.  With total U.S. consumption amounting to 816 million

ball bearings, the ITC observed that the subject countries could potentially capture an additional

[[    ]] percent of U.S. consumption by utilizing their excess capacity.  Viewed in this context, the

subject producers do indeed possess a significant level of excess capacity, [[                    ]]

bearings, in relation to apparent U.S. consumption of 816 million bearings.  Furthermore, the ITC

incorporated other conditions within the industry–such as the modest increase in demand for

bearings, export orientation of subject producers, current volume in the U.S. market, high degree

of substitutability, and price incentives to shift exports to the United States–to support its

determination concerning the likely use excess capacity.  *See CV* at 65.  For these reasons, the

court is convinced that the ITC properly evaluated this issue in its likely volume analysis.  *See*

§ 1675a(a)(2)(A).

In considering market share, Plaintiff-Intervenors attribute the decline in U.S.

consumption (by quantity) of the subject imports to global restructuring, which is in contrast to

the ITC's position claiming that the underlying antidumping orders are mainly responsible for the

decrease in subject imports.  *See Staff Report*, Table C-2.  By value, however, the subject

producers have maintained their presence in the U.S. market despite the added burden of

antidumping duties, and have actually grown market share from 12.9[19] percent in 2000 to 13.2

percent in 2005.  *Id*. at 62.  This discrepancy is primarily due to the rapid increase in the average

unit values of ball bearings during the second review, which offset the monetary losses that

would have resulted from declining volumes of subject imports.  *See Staff Report* at BB-V-1; *CV*

---

[19] *See supra* note 12.

at 67-68; Oral Argument Tr. 76.  The ITC concluded that the significant presence of subject

imports after imposition of the orders, in conjunction with other findings, would likely lead to a

significant rise in volume of subject imports if the orders were removed.

Curiously, in the context of assessing the likelihood of continued *dumping*, a decrease in

market share after imposition of an order signifies that the importers must rely on dumping to

compete in the U.S. market, whereas the maintenance or growth of market share with a

corresponding decrease in underselling signifies that importers can compete without dumping,

thereby reducing the likelihood of dumping if the order is removed.  *See Policies Regarding the*

*Conduct of Five-year ("Sunset") Reviews of Antidumping and Countervailing Duty Orders;*

*Policy Bulletin*, 63 Fed. Reg. 18,871, 18,872 (Dep't Commerce Apr. 16, 1998) ("*Policy*

*Bulletin*").  In summarizing the first reviews, the ITC alluded to this when it stated "the

Commission acknowledged several factors which . . . 'on their face' could indicate significant

additional subject import volumes upon revocation would be *unlikely* including *the fact that*

*subject imports were significantly higher than during the original investigation*, capacity

utilization rates in most subject countries were already high, and product shifting was difficult."

*CV* at 61 (emphasis added).  The ITC then observed that during the second review,

> subject producers . . . generally *have continued to ship to the United States in*
> *significant volumes despite the orders*, especially in the latter part of the review
> period when cumulated subject imports *increased by value*. The ongoing and
> significant presence of subject imports in the U.S. market demonstrates the
> continued importance of the U.S. market to subject producers and further shows
> that subject imports already have distributors or customers in place for their
> products.

*CV* at 62-63.  The court does not doubt the accuracy of this observation, but must question the

disparate treatment of similar findings from one sunset review to another.[20]  In the former,

increased subject imports were treated as a negative indicator of likely material injury, while in

the second review, the ITC cited continued volumes of subject imports to support the opposite

position.  Inasmuch as the ITC accepts that the maintenance or growth of imports under the

discipline of an order represents a contra-indicator of likely injury, the court is uncertain in this

instance as to what set of circumstances might lead the ITC to conclude that there is no

likelihood of injury due to increased volume or whether such a conclusion is even possible short

of a complete cessation of imports from the subject countries.

            The court also questions the ITC's determination that subject producers can quickly shift

exports to the United States.  It stated that the subject producers can shift exports "relatively

quickly from one market to another," despite recognizing without much explanation that "15

foreign producers/exporters reported that shifting [ball bearing] sales between United States and

alternative markets was 'difficult' while three firms characterized the shift as 'easy.'"  *CV* at 64

& n.349.  Relying on several numerical tables in the *Staff Report*, the ITC cites yearly

fluctuations in subject exports to the United States to illustrate how quickly the subject producers

can shift exports.  *See Staff Report* at BB-IV-46-IV-49 Tables BB-IV-11-IV-17.  This is in

contrast to the first reviews in which the ITC held that product shifting was difficult.  *See CV* at

61.

            In general, however, the United States remains an attractive market for the subject

_____

            [20] This is inconsistent with Commerce's position in its sunset review *Policy Bulletin*, which states that "declining (or no) dumping margins accompanied by steady or increasing imports may indicate that foreign companies do not have to dump to maintain market share in the United States and that dumping is less likely to continue or recur if the order were revoked."  *See Policy Bulletin*, 63 Fed. Reg. at 18,872 (quotations omitted).

producers' ball bearings. The United States is the second largest destination for imported ball

bearings and the subject producers are among the world's top exporters. *See CV* at 63. And with

higher prices available in the U.S. market as compared to other foreign markets, there is

incentive to shift available capacity to capture U.S. sales. *See Staff Report* at BB-V-6; *CV* at 64

& n.351. As the subject producers have at their disposal a significant level of excess capacity, at

this stage Plaintiffs failed to demonstrate that substantial evidence does not support the ITC's

likely volume finding in spite of some inconsistent conclusions contained in the first and second

reviews.

### 3. Likely Price Effects

In evaluating the likely price effects of subject imports, the ITC must

consider whether

> (A) there is likely to be significant *price underselling* by imports of the subject
> merchandise as compared to domestic like products, and (B) imports of the
> subject merchandise are likely to enter the United States at prices that otherwise
> would have a *significant depressing or suppressing effect* on the price of domestic
> like products.

§ 1675a(a)(3) (emphasis added). The ITC "may rely on circumstantial, as well as direct,

evidence of the adverse effects of unfairly traded imports on domestic prices." SAA at 4211.

In its explanation of likely price effects, the ITC premised its findings on the "limited

pricing data" collected during the review and lack of clear evidence of "significant patterns of

underselling or overselling."[21]  *CV* at 67. Based on the purchaser responses, however, the record

---

[21] In 2005, "reported pricing data (by quantity) [existed] for approximately 2.9 percent of
U.S. producers' shipments of [ball bearings], 11.0 percent of U.S. shipments of subject imports
from France, 0.7 percent of U.S. shipments of subject imports from Germany, 1.2 percent of U.S.
shipments of subject imports from Italy, 1.8 percent of U.S. shipments of subject imports from
Japan, and 0.1 percent of U.S. shipments of subject imports from the United Kingdom. In 2005,

demonstrates that price is an important factor in purchasing ball bearings.  *See id.*; *Staff Report* at

BB-II-21-II-22 Tables BB-II-1, BB-II-2.  Because the ITC found subject ball bearings

substitutable for domestic bearings, it also found a substantial likelihood of underselling to gain

market share.  *See CV* at 67.  In relation to its finding of likely volume, the ITC estimated that the

level of volume would likely have a suppressing effect on the prices of domestic bearings.

Specifically, prices for ball bearings have appreciated significantly during the second review due

in large part to higher raw material costs, and as a result, the ITC is concerned that underselling

by subject producers would interrupt the current rise in prices necessary to cover the cost of

production.[22]

        As an initial matter, Plaintiffs and Plaintiff-Intervenors dispute whether substantial

evidence supports the ITC's likely price effects determination because of the minuscule sample

of pricing data.  Pl. Joint Br. 40-41; Pl.-Int. Br. 25.  Plaintiffs further argue that U.S. purchasers

ranked "quality" higher than "price" in terms of relative importance in purchasing decisions,

thereby reducing the likelihood that the subject producers would gain market share from

underselling if the orders were removed.  Accordingly, they claim that the ITC's findings with

regard to underselling are unsupported by the evidence of record.  Pl. Joint Br. 41.

        The court holds that there is sufficient evidence to support the ITC's determination that

_____

reported pricing data (by value) accounted for approximately 0.5 percent of U.S. shipments of
[ball bearings], 1.3 percent of U.S. shipments of subject imports from France, 0.4 percent of U.S.
shipments of subject imports from Germany, 1.6 percent of U.S. shipments of subject imports
from Italy, 1.3 percent of U.S. shipments of subject imports from Japan, and 0.4 percent of U.S.
shipments of subject imports from the United Kingdom."  *Staff Report* at 67 n.362.

        [22] During the second period of review, "the price of steel bar, the primary raw material in
[ball bearings], increased from $[[    ]] per ton in 2000 to $[[    ]] per ton in 2005."  *CV* at 68
n.365.

price is an essential factor in purchase decisions.  According to questionnaire responses, price

ranked second behind quality in terms of the most important factors for purchasers and 43 of 49

purchasers considered it "very important."  *See CV* at 67 n.363, BB-II-21, II-22.  Though several

other factors were equal to or surpassed price on the scale of importance, other questionnaire

responses by purchasers demonstrate that the subject ball bearings are in fact substitutable.  *See

supra* text 18-20.  The more substitutable a product, the more likely price will play a significant

role in purchasing.  *See CV* at 67.

Turning to the sufficiency of the pricing data, the court is concerned because the ITC's

findings regarding likely underselling seems to be based on a relatively small sample of price

comparisons for subject and domestic ball bearings.  This is true even though courts have

generally deferred to the ITC on this issue as "Congress set no minimum standard by which to

measure the thoroughness of a Commission investigation, and the Commission has broad

discretion to pursue an investigation in a manner that will provide substantial evidence for its

determinations."  *Granges Metallverken AB v. United States*, 13 CIT 471, 481, 716 F. Supp. 17,

25 (1989) (citations omitted).  While "it is the ITC's burden to collect all data necessary to its

investigation, generalized allegations that a sample of products is not representative are not

enough to meet the threshold requirement to support such a claim.  Rather, [Plaintiff] must

"point[ ] to . . . quantitative evidence to indicate that the sampled data relied on by the

Commission was not representative."  *Am. Bearing Mfrs. Ass'n*, 28 CIT at 1715, 350 F. Supp. 2d

at 1116 (quotations & citations omitted); *see U.S. Steel Group v. United States*, 96 F.3d 1352,

1366 (Fed. Cir. 1996); *Kern-Liebers U.S.A., Inc. v. United States*, 19 CIT 87, 112-15 (1995) (not

reported in F. Supp.).

In this review, the ITC selected ten different models of ball bearings from six subject countries as the basis for comparisons in two different markets, sales to distributors and end users, between January 2000 and December 2005.  *See Staff Report* at BB-V-8, BB-V-12 Table BB-V-2.  Although there is still disagreement over the number of possible comparisons, the ITC was able to make only 383 price comparisons.[23]  In those 383 samples in which pricing data was available, there were 207 instances of underselling and 176 instances of overselling.  *See Staff Report* at BB-V-12.  In 2005, the reported pricing data by quantity "accounted for approximately . . . 1.8 percent of U.S. shipments of subject imports from Japan, and 0.1 percent of U.S. shipments . . . from the United Kingdom."  *CV* at 67 n.362.  By value, reported pricing data accounted for "1.3 percent of U.S. shipments of subject imports from Japan, and 0.4 percent of U.S. shipments . . . from the United Kingdom."  *Id*.  Thus, in a sample that represents a small fraction of the subject producers' total shipments, the results revealed slightly more instances of underselling than overselling.  Some cases have accepted the findings of small pricing samples on the basis of agency deference, placing the burden on the claimant to demonstrate that a tiny sample of total imports is unrepresentative and therefore unsupported by substantial evidence.  *See, e.g.*, *U.S. Steel Group*, 96 F.3d at 1366.  Even if the court were to accept the small pricing sample as an accurate representation of total imports, it remains unclear whether underselling is probable based on the ambiguous data provided in the *Staff Report*.  *See Staff Report* at BB-V-11-V-12 Tables BB-V-1, BB-V-2.  The ITC admits that "the limited

---

[23] The court is unclear as to how many quarters of available pricing data were actually available.  Plaintiffs and Plaintiff-Intervenors claim that there were 2,880 quarters in which comparisons could have been made, whereas Defendant argues that those quarters did not allow for a domestic versus subject import pricing comparison.  Pl.-Int. Br. 25; Def. Resp. Br. 32 & n.10; Oral Argument Tr. 77-78.

pricing data collected in the current reviews do not give clear evidence of significant pattern of underselling or overselling, although underselling occurred in more than half of the transactions covered, even with the orders in place." *CV* at 67. Imported bearings from Japan undersold the domestic like product in 96 instances versus 94 instances of overselling. Imported bearings from the United Kingdom undersold U.S. bearings in almost every instance, except the U.K. sample provided comparisons for only *one* type of ball bearing. *See Staff Report* at BB-V-12 Table BB-V-2. Further, the prices associated with that particular type of ball bearing increased over the same period of review, which casts doubt on the significance of those corresponding instances of underselling. *See id.* at BB-V-11 Table BB-V-1. The court can discern no meaningful trend from this information and is not persuaded that underselling is likely based on the fact that it occurred in just over fifty percent of a deficient sample. Therefore, the pricing data does not demonstrate by substantial evidence that significant underselling would likely occur if the orders were removed.

However, the court need not remand on the general issue of likely price effects because the ITC has provided substantial evidence that subject imports are likely to enter the United States at prices that would have a significant depressing or suppressing effect on the domestic industry. *See* § 1675a(a)(3)(B). Due to the fact that subject imports are substitutable with the domestic like product, the ITC concluded that "subject imports would likely be priced aggressively to gain market share, and would undersell the domestic like product by substantial margins so as to significantly suppress domestic prices." *CV* at 67. Based on its analysis of likely volume, the ITC also determined that "significant volumes of subject imports are likely to suppress the price increases necessary to compensate for the domestic industry's increasing

costs." *Id.* As demand for ball bearings is not expected to increase dramatically within the

foreseeable future, there is a strong likelihood that competitive pricing will be a significant factor

in purchasing decisions. Under these circumstances, the ITC reasonably held that removal of the

orders would likely lead to significant underselling and price suppression within the foreseeable

future.

### 4. Impact on the Industry

Under § 1675a(a)(4), the ITC must

> evaluat[e] the likely impact of imports of the subject merchandise on the industry
> if the order is revoked or the suspended investigation is terminated, the
> Commission shall consider all relevant economic factors which are likely to have
> a bearing on the state of the industry in the United States, including, but not
> limited to--
>
>> (A) likely declines in output, sales, market share, profits, productivity,
>> return on investments, and utilization of capacity,
>> (B) likely negative effects on cash flow, inventories, employment, wages,
>> growth, ability to raise capital, and investment, and
>> (C) likely negative effects on the existing development and production
>> efforts of the industry, including efforts to develop a derivative or more
>> advanced version of the domestic like product.
>
> The Commission shall evaluate all relevant economic factors described in this
> paragraph within the context of the business cycle and the conditions of
> competition that are distinctive to the affected industry.

§ 1675a(a)(4).

Due to several negative indicators of market performance in the domestic industry,

the ITC concluded that

> the industry is currently vulnerable to material injury. . . . [W]e have concluded
> that revocation of the antidumping duty orders on [ball bearings] from [the subject
> countries] would lead to significant increases in the volume of subject imports.
> Because the subject imports are substitutable for the domestic like product, and
> the domestic industry supplies the majority of the U.S. market, any increase in
> subject import volumes will likely be in large part at the expense of an already

vulnerable domestic industry. In light of the fact that U.S. demand for [ball bearings] is unlikely to show robust increases in the reasonably foreseeable future, such increases in subject import volume will likely have the effect of exacerbating the declines in capacity, production, market share, employment, and capital expenditures.  Additionally, because of likely aggressive pricing of the subject imports, the domestic industry will either need to cut prices for the domestic like product or lose sales.  Under either scenario, the domestic industry's revenues will likely decline significantly in light of the anticipated volume of subject imports. This, in turn, will likely lead to further declines in the industry's operating performance, which will continue the trend of declining profitability for the industry in the reasonably foreseeable future.

*CV* at 71.

In accordance with the issues raised in this opinion, the ITC must reconsider its impact analysis on remand.  The court has held that the ITC must provide a more comprehensive discussion of supply conditions and must also evaluate the impact of non-subject imports in accordance with *Bratsk*.  As these determinations may influence the ITC's likely impact analysis, the court's decision on the issue must await the ITC's remand results.

## IV. CONCLUSION

For the reasons discussed herein, Plaintiffs' motion for judgment on the agency record is granted in part and denied in part.


Dated:   September 9, 2008                                    /s/ Judith M. Barzilay
         New York, NY                                      Judge Judith M. Barzilay

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| NSK CORPORATION, *et al.*, | : | |
| Plaintiffs, | : | |
| and | : | |
| FAG ITALIA SpA, *et al.*, | : | |
| Plaintiff-Intervenors, | : | |
| | : | Before: Judith M. Barzilay, Judge |
| v. | : | Consol. Court No. 06-00334 |
| UNITED STATES, | : | |
| Defendant, | : | |
| and | : | |
| THE TIMKEN COMPANY, | : | |
| Defendant-Intervenor. | : | |

## JUDGMENT

In accordance with the legal findings contained herein, the court remands the ITC's *Final Determination* for a full analysis of non-subject imports pursuant to *Bratsk* and to reassess supply conditions within the domestic industry. See *Bratsk Aluminum Smelter v. United States*, 444 F.3d 1369 (Fed. Cir. 2006). The ITC shall also consider whether these findings on remand effect the final analysis of likely impact and the decision to cumulate subject imports from the United Kingdom. Accordingly, it is hereby

ORDERED that the ITC shall conduct a *Bratsk* analysis of non-subject imports as outlined in this opinion; it is further

ORDERED that the ITC shall reassess supply conditions within the domestic industry; it is further

ORDERED that the ITC shall reexamine its findings with regard to likely impact and its decision to cumulate imports from the United Kingdom in light of changes in its determinations that may result as a consequence of the foregoing remand instructions; and it is further

ORDERED  that the ITC shall have until January 7, 2009 to file its remand results with the Court.  Plaintiffs, Plaintiff-Intervenors and Defendant-Intervenors shall file their responses no later than February 23, 2009.


Dated: _September 9, 2008_
New York, NY

/S/_____     Judith M. Barzilay_____
                      Judge

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                          Deputy Clerk