Slip Op. 08-145

UNITED STATES COURT OF INTERNATIONAL TRADE

—————————————————————
                                                    :
NSK CORPORATION, *et al.*,                          :
                                                    :
            Plaintiffs,                             :
                                                    :
      and                                           :
                                                    :
FAG ITALIA SpA, *et al.*,                           :
                                                    :
            Plaintiff-Intervenors,                  :
                                                    :     Before: Judith M. Barzilay, Judge
      v.                                            :     Consol. Court No. 06-00334
                                                    :
UNITED STATES,                                      :
                                                    :
            Defendant,                              :
                                                    :
      and                                           :
                                                    :
THE TIMKEN COMPANY,                                 :
                                                    :
            Defendant-Intervenor.                   :
—————————————————————:


OPINION AND ORDER


[Defendant and Defendant-Intervenor's Motions for Rehearing are denied.]


Dated:  December 29, 2008


*Crowell & Moring LLP*, (*Matthew P. Jaffe*), *Robert A. Lipstein*, and *Carrie F. Fletcher*; *Sidley Austin LLP*, *Neil R. Ellis* and *Jill Caiazzo* for Plaintiffs.

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP*, (*Max F. Schutzman*), and *Andrew T. Schutz*; *Steptoe & Johnson, Herbert C. Shelley*, for Plaintiff-Intervenors.

United States International Trade Commission, (*James M. Lyons*), *David A.J. Goldfine*, and *Neal J. Reynolds*, Office of the General Counsel, for Defendant United States.

*Stewart and Stewart*, (*Terence P. Stewart*), and *Eric P. Salonen* for Defendant-Intervenor.

     **BARZILAY, JUDGE**:  The issue in this case arises from an opinion issued by the

Federal Circuit in *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867 (Fed. Cir. 2008)

("*Mittal*"), on September 18, 2008 clarifying its decision in *Bratsk Aluminum Smelter v. United

States*, 444 F.3d 1369 (Fed. Cir. 2006) ("*Bratsk*").  Nine days earlier on September 9, 2008, this

court issued an opinion and order in *NSK Corp. v. United States*, 32 CIT ___, 577 F. Supp. 2d

1322 (2008) ("*NSK*").  In *NSK*, the court determined that when certain conditions are present the

causation analysis prescribed by *Bratsk* is required in the context of a sunset review.  Defendant

United States and Defendant-Intervenor The Timken Company ("Timken") move this court to

rehear its opinion in *NSK* in light of *Mittal* pursuant to United States Court of International Trade

("USCIT") Rule 59(e).[1]  Defendant and Defendant-Intervenor ask for rehearing here because they

believe the decision issued by the Federal Circuit nine days after the court issued its remand

instructions in this sunset review rendered those remand instructions contrary to controlling law.

The specific issue before the court is whether the decision in *Mittal* is an intervening change in

the controlling law such that this court's opinion in *NSK* is significantly flawed or manifestly

erroneous.  For the following reasons, the court denies Defendant and Defendant Intervenor's

Motions for Rehearing.

---

[1] Timken joins this proceeding as a matter of right under USCIT Rule 24.  While only the Defendant's claims are mentioned, Timken's contentions are identical to those of the United States and, thus, adequately addressed by the court in this opinion.

## I. Background

### A. *NSK* September 2008 Opinion

In *NSK*, Plaintiffs NSK Corporation, NSK Ltd., NSK Europe Ltd., JTEKT Corporation, and Koyo Corporation of U.S.A. (collectively, "Plaintiffs") requested that the court remand certain determinations included in the final results to the United States International Trade Commission's ("ITC") second sunset review covering ball bearings from China, France, Germany, Italy, Japan, Singapore, and the United Kingdom. *See Certain Bearings From China, France, Germany, Italy, Japan, Singapore, and the United Kingdom; Investigation Nos. 731-TA-344, 391-A, 392-A and C, 393-A, 394-A, 396 and 399-A (Second Review)*, 71 Fed. Reg. 51,850 (ITC Aug. 31, 2006) ("*Final Results*").  Representing both foreign and domestic producers of ball bearings, Plaintiffs challenged the ITC's conclusion that revocation of the underlying orders would likely lead to a continuation or recurrence of material injury to the domestic industry within a reasonably foreseeable time.[2]  *See Final Results*, 71 Fed. Reg. at 51,850; 19 U.S.C. §§ 1675(c) & 1675a(a).

Plaintiffs' request was granted in part and denied in part.  The principal reason the court remanded the *Final Results* was its conclusion that *Bratsk* applies to the ITC's analysis of whether material injury is likely to continue or recur if an antidumping order is revoked. Specifically, the court held that where the triggering factors are present—i.e., where (1) there is a commodity product at issue and (2) price competitive non-subject imports are a significant factor

---

[2] For a full explanation of the ITC's reasoning, see *Certain Bearings from China, France, Germany, Italy, Japan, Singapore, and the United Kingdom; Investigation Nos. 731-TA-344, 391-A, 392-A and C, 393-A, 394-A, 396 and 399-A (Second Review)*, USITC Pub. 3876 (Aug. 2006) ("*Staff Report*"), *available at* http://hotdocs.usitc.gov/docs/pubs/701_731/pub3876.pdf.

in the market—the "ITC must consider whether non-subject imports have captured or are likely to capture market share previously held by subject imports, and whether this level of displacement makes it unlikely that removal of the orders will lead to a continuation or recurrence of material injury as a result of subject imports." *NSK*, 577 F. Supp. 2d at 1333 (citations omitted). Defendant had argued that any analysis under *Bratsk* requires a rigid "replacement-benefit" test that is inconsistent with the multifaceted sunset review analysis outline in the statute. *Id*. at 1331 (citations omitted). In response, the court made clear that "applying *Bratsk* to sunset reviews will not require the ITC to adopted a rigid 'benefit' analysis or sacrifice discretion in determining the likelihood of material injury under § 1675a(a)." *Id*. at 1333 (citations omitted).[3]

The court found that the ITC's analysis was also incomplete in two other respects. First, the court remanded the ITC's decision to cumulate imports from the United Kingdom with subject imports from France, Germany, Italy and Japan because it failed to consider the significant rise in non-subject imports and large scale restructuring within the ball bearing industry. *See id*. at 1337-38. The court required that the ITC provide additional explanation as to whether the potential volume of the subject merchandise would likely have an adverse impact on the domestic industry if the order is removed. Second, the court held that a more thorough examination of the supply conditions of the domestic industry was warranted given the information that suggested global restructuring may have depressed certain economic measures

---

[3] As we discuss *infra*, we believe this is what the *Mittal* court required of the ITC in its remand. The ITC is afforded great discretion and "is not required to follow a single methodology for making [the causation] determination." *Mittal*, 542 F.3d at 873. Also, the ITC is not required "to address the causation issue in any particular way . . . ." *Id*. at 878 (footnote omitted).

of industry performance.  *See id*. at 1338-39.  The ITC had relied upon these measures to cast the

U.S. market as vulnerable.  *See id*.

### B. Defendant's Motion for Rehearing

Defendant alleges that the Federal Circuit's decision in *Mittal* is an intervening change in

the controlling law and, as a result, the court committed two significant legal errors making the

decision in *NSK* manifestly erroneous.  Defendant complains that the initial legal error

committed by the court concerns the triggering factors.  Def. Br. 18.  Specifically, Defendant

avers that the court, and not the ITC, determined "(1) whether subject ball bearings constitute a

'commodity product' for purposes of determining substitutability and (2) whether non-subject

imports are a significant factor in the U.S. market."  Def. Br. 18 (quoting *NSK*, 577 F. Supp. 2d

at 1333).  Defendant contends that the court usurped the ITC's authority when it allegedly (1)

"found that the record indicated that the domestic and subject bearings were generally considered

'always' or 'frequently' interchangeable," and (2) "concluded that 'non-subject imports were a

significant factor in the domestic industry.'"  Def. Br. 18-19 (quoting *NSK*, 577 F. Supp. 2d at

1334) (brackets omitted).

The second alleged significant legal error committed by the court is its interpretation of

*Bratsk*.  Defendant argues that the court misread *Bratsk* in four respects.  First, Defendant alleges

that the Federal Circuit expressly rejected the application of *Bratsk* to sunset reviews in *Mittal*.

Def. Br. 13-14.  It claims that *Mittal* clarified that *Bratsk* is "*not* addressed to the potential

effectiveness of any possible remedial order" but is "directed to determining the cause of the

injury *already suffered*," and, thus, does not support the court's holding that *Bratsk* extends to

sunset reviews.  Second, the court erred when it found that *Bratsk* required the ITC to examine

"'*the effectiveness of the underlying antidumping order* in relation to fundamental changes in the

marketplace that might be more likely to cause injury to the domestic industry than unrestrained

subject imports.'"  Def. Br. 14 (quoting *NSK*, 577 F. Supp. 2d at 1333).  Defendant contends that

*Mittal* makes clear that the principal aim of *Bratsk* is to determine the underlying cause of the

injury, not the effectiveness of an antidumping order.  Third, Defendant argues that *Mittal* stands

for the proposition that *Bratsk* is limited to the retrospective causation analyses that occur in

antidumping investigations and, therefore, *Bratsk* should not extend to prospective "threat of

material injury" analyses and sunset reviews.[4]  Def. Br. 14-15.  Fourth, Defendant argues that

*Mittal* expressly rejects the idea that *Bratsk* is a required aspect of the ITC's threat of material

injury analysis and, thus, should be excluded from sunset reviews.  Def. Br. 15-16.  Because a

threat of material injury analysis and sunset review require the ITC to engage in similar

assessments, Defendant alleges that the court erred when it held that *Bratsk* was a necessary

element of the causation analysis in a sunset review.  Def. Br. 15-16.

----

[4] There is a "threat of material injury" to a domestic industry where the ITC determines that such injury is "*by reason of imports* . . . of the [subject] merchandise. . . ."  19 U.S.C. § 1673d(b)(1) (emphasis added).  In its analysis, the ITC must consider several statutory factors to determine "whether further dumped . . . imports are imminent and whether material injury by reason of imports would occur unless an order is issued . . . ."  19 U.S.C. § 1677(7)(F)(ii).  Essentially, the task of the ITC is to determine "whether injury is *imminent*, given the status quo."  *Statement of Administrative Action Accompanying the Uruguay Round Agreements Act*, H.R. Rep. No. 103-316 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4209 ("*SAA*") (emphasis added).  "The statute thus requires a determination of a temporal relationship ('imminent') and a causal connection ('by reason of') between the [less than fair value ('LTFV')] imports and the threat of material injury."  *Goss Graphics Sys., Inc. v. United States*, 216 F.3d 1357, 1362 (Fed. Cir. 2000) (citations omitted).

## II. Rehearing under Rule 59 & Standard of Review

When made within thirty days of the Court's final judgment, a motion under Rule 59(e)

"seeks vacature or alteration of [that] . . . judgment." *Ford Motor Co. v. United States*, Slip Op.

06-145, 2006 WL 2789856, at *3 (Sept. 29, 2006) (not reported in F. Supp.); USCIT R. 59(e).

"The major grounds justifying a grant of a motion to reconsider a judgment are an intervening

change in the controlling law, the availability of new evidence, the need to correct a clear factual

or legal error, or the need to prevent manifest injustice." *Ford Motor Co.*, 2006 WL 2789856 at

*1. Even so, "a clear legal error will not require a court to grant a motion for reconsideration

where that error does not affect the result reached in the first instance." *Id.* (citing USCIT R. 61).

Defendant's reliance on Rule 59(e), however, is misplaced. That rule permits the Court

to alter or amend only a *final* judgment.[5]  USCIT R. 59(e) (emphasis added). Consistent with this

understanding, "the federal courts generally have invoked Rule 59(e) only to support

reconsideration of matters properly encompassed in a decision on the merits."[6]  *White v. N.H.*

---

[5] The distinction between an interlocutory order and a final judgment is essential to the inquiry at bar. An "interlocutory order" is one that "does not finally determine or complete the suit. . . . [Rather, a]n interlocutory [order] is one which reserves or leaves some further question or direction for future determination." *Black's Law Dictionary* 843 (6th ed. 1990) (citation & quotations omitted). A "final judgment," however, "is the *final* decision of the court resolving the dispute and determining the rights and obligations of the parties." *Id*. at 841-42 (emphasis added).

[6] "The Rules of this court provide the starting point for analysis. However, given the similarity between this court's . . . rules and the parallel rules in the Federal Rules of Civil Procedure [("FRCP")], the jurisprudence of other circuit courts is a valuable interpretive tool." *See Auto Alliance Intern., Inc. v. United States*, 32 CIT ___, 558 F. Supp. 2d 1377, 1380 (2008) (citing USCIT R. 1; *Zenith Radio Corp. v. United States*, 10 CIT 529, 530 n.7, 643 F. Supp. 1133, 1135 (1986)). Interpreting FRCP Rule 59(e), the United States Supreme Court decisively noted that

*Dep't of Employment Sec.*, 455 U.S. 445, 451 (1982).  The decision in *NSK* was not a final

determination of the rights of the parties, but rather is instead characterized as an interlocutory

order.  Specifically, the court in *NSK* remanded the case to the ITC with instructions to collect

additional evidence for the injury determination in the sunset review at issue.  Thus, Defendant

incorrectly moves the court under Rule 59(e).

Alternatively, the Court has the discretion to rehear a motion that results in an

interlocutory order pursuant to USCIT Rule 59(a)(2).[7]  "On its face, Rule 59[(a)] provides for

rehearings in actions which have been tried and gone to [final] judgment, which is not the case

here."  *Nat'l Corn Growers Ass'n v. Baker*, 9 CIT 571, 584, 623 F. Supp. 1262, 1274 (1985).

"Nevertheless, it has been held that the 'concept of a new trial under Rule 59[(a)] is broad

enough to include a rehearing of any matter decided by the court without a jury.'"  *Id.* (quoting

*Timken Co. v. United States*, 6 CIT 76, 77, 569 F. Supp. 65, 67 (1983)).  In other words, Rule

---

[the] draftsmen [of Rule 59(e)] had a clear and narrow aim.  According to the
accompanying Advisory Committee Report, . . . [Rule 59(e)] was adopted to make
clear that the district court possesses the power to rectify its own mistakes in the
period immediately following the *entry of judgment*.

*White*, 455 U.S. at 451 (emphasis added) (footnote omitted).

[7] Rule 59(a)(2) provides that a rehearing may be granted on all or part of the issues "in an
action tried without a jury or in an action finally determined . . . ."  USCIT R. 59(a)(2).  The court
is aware that other federal courts rely on FRCP Rule 54(b) to reconsider interlocutory orders.
*See, e.g.*, *Judicial Watch v. Dep't of Army*, 466 F. Supp. 2d 112, 123 (D.D.C. 2006).  Indeed, the
language in USCIT Rule 54(b) is nearly identical to that of FRCP Rule 54(b).  However, we
decline to find the authority to rehear interlocutory orders under USCIT Rule 54(b) given the
minor, but significant, differences in the language and structure of USCIT Rule 59 and FRCP
Rule 59, and in light of this Court's unique jurisdiction and precedent.

59(a)(2) authorizes the Court to rehear any motion before the court, regardless of whether it

concerns a final judgment or an appealable order.  *See id*.

   The Court has suggested in the past that a Motion for Rehearing under Rule 59(a)(2) is

available only for orders appealable under 28 U.S.C. § 1292.[8]  *See, e.g.*, *Witex, U.S.A., Inc. v.

United States*, 29 CIT 154, 360 F. Supp. 2d 1327 (2005).  The court in *Witex, U.S.A.* stated that

Rule 59(a)(2) did not allow "parties to file motions . . . for reconsideration of interlocutory

orders."  29 CIT at 155 n.2, 360 F. Supp. 2d at 1328 n.2.  The court held that the rehearing of a

motion for summary judgment was improper since the parties were not barred from making

further argument or producing additional evidence.  *See id*.  The court in *Witex, U.S.A.* cites to

*National Corn Growers Ass'n* also as support for its holding.  *See id*.  We read *National Corn

Growers Ass'n* to suggest that, notwithstanding the limited reading of Rule 59(a) by other courts,

the ultimate "determination of a motion for rehearing lies within the sound discretion of the

court."  9 CIT at 584, 623 F. Supp. at 1274 (citing *Commonwealth Oil Ref. Co., Inc. v. United

States*, 60 CCPA 162, 166, 480 F.2d 1352, 1355 (1973)).  Therefore, the court will exercise this

discretion and consider the parties' motion for rehearing pursuant to Rule 59(a)(2).

   Nonetheless, as the Court made clear in *Witex, U.S.A.*, and earlier, "[t]he purpose of a

rehearing is not to relitigate a case," but rather "only serves to rectify 'a significant flaw in the

---

[8] Section 1292(c)(1) provides the Federal Circuit with the exclusive appellate jurisdiction over interlocutory orders of the USCIT that (a) grant, continue, modify, refuse, or dissolve an injunction, or refuse to dissolve or modify an injunction, or that (b) appoint receivers or refuse orders to wind up receiverships.  *See* § 1292(a), (c)(1).  In limited situations, § 1292(d)(1) grants the Federal Circuit jurisdiction over interlocutory orders from the USCIT involving a controlling question of law where there is substantial ground for difference of opinion and an immediate appeal from the order may materially advance the termination of the litigation.  § 1292(d)(1).

conduct of the original proceeding'" and "[t]he [C]ourt will not disturb its prior decision unless it

is 'manifestly erroneous.'" *Starkey Labs., Inc. v. United States*, 24 CIT 504, 505, 110 F. Supp.

2d 945, 947 (2000) (citations omitted).  Circumstances where a court's decision has been found

to be "significantly flawed" or "manifestly erroneous" include:

> (1) an error or irregularity in the trial; (2) a serious evidentiary flaw; (3) a discovery
> of important new evidence which was not available even to the diligent party at the
> time of trial; or (4) an occurrence at trial in a nature of an accident or unpredictable
> surprise or unavoidable mistake which impaired a party's ability to adequately
> present its case.

*Ammex, Inc., v. United States*, 26 CIT 510, 511, 201 F. Supp. 2d 1374, 1375 (2002) (citation

omitted).  Ultimately, however, the Court may rehear a matter that is significantly flawed or

manifestly erroneous to "correct a miscarriage of justice."  *See Nat'l Corn Growers Ass'n*, 9 CIT

at 585, 623 F. Supp. at 1274.

### III. Discussion

### A. "Causation" in Sunset Reviews under 19 U.S.C. §§ 1675(c) & 1675a(a)

Of paramount concern in *Gerald Metals*,[9] *Bratsk*, *Mittal*, and *NSK* was whether the

subject imports were the cause of injury, or would cause continuation or recurrence of injury, to

the domestic industry.  *Gerald Metals*, *Bratsk*, and *Mittal* dealt with the cause of injury already

suffered in the setting of an antidumping investigation, whereas *NSK* focused on the potential

continuation or recurrence of injury in the future in a sunset review.  The starting point for the

court's consideration of Defendant's motion is to conduct a thorough examination of the

statutory demands placed on the ITC in a sunset review.

---

[9] *Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ("*Gerald Metals*").

After five years from the date of publication of an antidumping order, § 1675(c) requires

the United States Department of Commerce ("Commerce") and the ITC to review whether

revocation of the antidumping order would be likely to lead to continuation or recurrence of (1)

dumping and of (2) material injury.  *See* § 1675(c).  With regard to the injury determination,

§ 1675a states that the ITC shall determine

> whether revocation of an order . . . would be *likely to lead to* continuation or
> recurrence of material injury within a reasonably foreseeable time.  The [ITC] shall
> consider the likely volume, price effect, and impact of imports of the subject
> merchandise on the industry if the order is revoked . . . .

§ 1675a(a)(1) (emphasis added).  Absent from § 1675a(a)(1) is clear and explicit causal language

that guides the ITC in its determination.[10]  Still, there is clearly an implied element of "causation"

contained in the statute.[11]  In *NSK*, the court stated that the term "likely" implied that "some

degree of causation is required in a sunset analysis."  577 F. Supp. 2d at 1332 n.9.  To clarify our

---

[10] A "cause" is a "separate antecedent of an event," or something that "precedes and
brings about an effect or a result."  *Black's Law Dictionary* 221 (6th ed. 1990).  That is, a
"cause" of an event is that which "in some manner is accountable for [a] condition that brings
about an effect or that produces a cause for the resultant action or state."  *Id.* (citation omitted).
Words that derive from the term "cause" include "causal", "causality", "causation", and
"causative", among others.  The term "causation" connotes "the act by which an effect is
produced."  *Id.*

[11] The Court's precedent makes clear that there exists an element of causation in sunset
reviews.  *See, e.g.*, *Usinor v. United States*, 26 CIT 767 (2002) (not reported in F. Supp.); *Neenah
Foundry Co. v. United States*, 25 CIT 702, 155 F. Supp. 2d 766 (2001); *Titanium Metals Corp. v.
United States*, 25 CIT 648, 155 F. Supp. 750 (2001).

opinion in *NSK*, the court reads the words "likely to lead to"[12] as asking the ITC to determine

whether revocation of the antidumping order would *cause* the domestic industry to suffer

material injury.[13]  That is, when read together the words "likely" and "lead" imply an element of

"causation" in sunset reviews that requires the ITC to answer whether it is probable that the

revocation of an antidumping order would result in continuation or recurrence of material injury

to the domestic industry.

That the language of § 1675a mentions the revocation of an antidumping order does not

mean that the focus of the causation analysis should be on the act of the removal of the order

itself.  Rather, the focal point of the inquiry is on the effect that the presence of subject

merchandise in the market place will have on the domestic industry in the absence of an order.

This analysis requires the ITC to engage in a speculative and counterfactual examination of the

domestic industry.  The specific issue in the causation analysis in a sunset review is whether the

subject imports themselves would be a substantial factor in the cause of injury to the domestic

---

[12] "Likely" means "probable," or as being of such nature as to "make something probable and having better chance of existing or occurring than not."  *Usinor*, 26 CIT at 794 (citation omitted); *Black's Law Dictionary* 925 (6th ed. 1990) (citation omitted).  Moreover, "lead" is used as a verb in § 1675a(a).  In that context, "lead" means to "tend toward or have a result."  *Webster's Ninth New Collegiate Dictionary* 679 (1988).

[13] In *NSK*, the court distinguished the statutory language that guides the ITC's causation analysis in an investigation from that which controls a sunset review.  In an injury investigation, "§ 1673d(b)(1) requires the ITC to establish injury to the domestic industry '*by reason of imports* . . . of the subject merchandise. . . .'"  *NSK*, 577 F. Supp. 2d at 1331 (citing § 1673d(b)(1)).  "The 'by reason of' language in § 1673d(b)(1) explicitly places an obligation on the ITC to demonstrate that the subject imports are *causing* material injury or a threat thereof to the domestic industry."  *Id*. at 1331-32 (citation omitted).  While the court recognized that the two standards are not identical, it nevertheless determined that "some degree of causation is required in a sunset analysis."  *Id*. at 1332 n.9.

industry,[14] rather than some secondary, "merely incidental, tangential, or trivial factor." *See*

*Mittal*, 542 F.3d at 879 (citations & quotations omitted).  To be sure, the ITC need not identify

and analyze every factor that could potentially cause injury to the domestic industry nor

determine that the subject merchandise is the "sole or principal cause of injury." *Nippon Steel*

*Corp. v. United States*, 345 F.3d 1379, 1381 (Fed. Cir. 2003).  Rather, the only duty imposed on

the ITC is to ensure that the subject imports, and not non-subject imports or some other factor,

would be substantially responsible for injury to the domestic industry.  *See id*.

        The last sentence of § 1675a(a)(1) buttresses our reading of the proper causation analysis

to be conducted by the ITC in a sunset review, which the court has noted "require[s] an inquiry

that considers whether subject imports will likely *cause* material injury to the domestic industry

after the order has been revoked.  This is logically implied by the mandate that the order be

revoked unless dumping and material injury would be likely to recur." *NSK*, 577 F. Supp. 2d at

1331 (citing § 1675(d)(2)).  That the ITC must consider the same three factors of volume, price,

and impact to establish injury both in the context of an investigation and in a sunset review

suggests "significant overlap in the statutory considerations that guide the ITC's evaluation of

material injury in an investigation and likelihood of material injury in a sunset review." *Id*. at

1332 (citing §§ 1677(7)(B)(i) & 1675a(a)(1); *Gerald Metals,* 132 F.3d at 719).  The court

expands its discussion of § 1675a(a)(1) to again emphasize that in a sunset review the ITC must

---

        [14] A "substantial factor" is an important circumstance or influence that brings about or produces a result.  *See Black's Law Dictionary* 592, 1428 (6th ed. 1990) (defining the terms "factor" and "substantial").

evaluate "whether removal of an antidumping order would likely result in material injury caused by or tied to subject imports." *Id*.

To be sure, the court recognizes that the causation inquiry in a sunset review is largely prospective. However, contrary to Defendant's claims, § 1675a(a) also asks the ITC to engage in the retrospective examination of some important elements when determinating whether the revocation of an order would be likely to lead to continuation or recurrence of material injury. Specifically, section 1675a(a)(1) provides that the ITC shall take into account

> (A) its prior injury determinations, including the volume, price effect, and impact of imports of the subject merchandise on the industry before the order was issued . . . ,
> (B) whether any improvement in the state of the industry is related to the order . . . , [and]
> (C) whether the industry is vulnerable to material injury if the order is revoked . . . .

§ 1675a(a)(1)(A)-(C). Essentially, subsections (A) through (C) necessarily require the ITC to retrospectively examine the effect of the subject merchandise on the domestic industry and use those findings to help it predict what conditions will be like in the future. The consideration under subsection (A) is important because

> this period is the most recent time during which imports of subject merchandise competed in the U.S. market free of the discipline of an order or agreement. If the [ITC] finds that pre-order . . . conditions are likely to recur, it is reasonable to conclude that there is likelihood of continuation or recurrence of injury.

*SAA* at 4209. Subsection (B) compels the ITC to ensure that the antidumping order on the subject merchandise prevented greater injury to the domestic industry. Under that subsection, the ITC "should not determine there is no likelihood of continuation or recurrence of injury simply because the industry has recovered after imposition of the order . . . ." *Id*. at 4209-10. Rather, "an improvement in the state of the industry *may* suggest that the state of the industry would

deteriorate if the order is revoked . . . ." *Id*. at 4210 (emphasis added).  Finally, subsection (C) is

important because it goes to the heart of the ITC's two-tiered analysis in a sunset review.  In that

subsection, a domestic industry would be vulnerable to material injury if it is susceptible "to

material injury by reason of dumped . . . imports." *Id*.  The concept of vulnerability derives from

"standards for material injury and threat of material injury." *Id*. (citation omitted).  In examining

the past injury, the ITC should consider imports and other factors that may have contributed to

overall injury. *See id*.  Looking forward, "the [ITC] must carefully assess current trends and

competitive conditions in the marketplace to determine the probable future impact of imports on

the domestic industry and whether the industry is vulnerable to future harm" that would be

caused by subject imports. *Id*.  "If the [ITC] finds that an industry is vulnerable to injury from

subject imports, it may determine that injury is likely to continue or recur, even if other causes, as

well as future imports, are likely to contribute to future injury." *Id*.

    While the central focus of the causation inquiry under § 1675a(a)(1) remains

prospective—i.e., whether revocation of an order would be likely to lead to continuation or

recurrence of material injury to the domestic industry—subsections (A) through (C) indicate

there are necessary elements of the causation analysis in a sunset review that are retrospective in

nature such that the ITC must analyze whether the subject imports were themselves the

substantial cause of the injury suffered.  Thus, in considering those factors under § 1675a(a)(1),

the ITC is to examine whether the subject imports were the cause of injury in the past and

whether they would be likely to lead to continuation or recurrence of injury in the future if the

antidumping order is removed.  While the ITC must consider all of these statutorily enumerated

factors, the presence or absence of any one  factor is not necessarily dispositive.  *See*

§ 1675a(a)(5).  Instead, the ITC must consider that "the *effects* of revocation . . . may not be

imminent, but may manifest themselves over a longer period of time."  *Id*. (emphasis added).

Finally, it is essential to note that the ITC is not required "to address the causation issue

in any particular way, or to apply a presumption that non-subject producers would have replaced

the subject imports if the subject imports had been removed from the market."  *Mittal*, 542 F.3d

at 878 (footnote omitted).  Rather, the primary responsibility of the ITC is "to consider the causal

relation between the subject imports and the injury to the domestic industry . . . ."  *Id*. at 877

(explaining that *Bratsk* does not require the ITC to employ a presumption that non-subject goods

would replace subject goods if the subject goods were removed from the market).  The ITC is

simply required "to give full consideration to the causation issue and to provide a meaningful

explanation of its conclusions."  *Id*. at 878 (citation omitted).  The ITC fulfills its statutory duty

by determining "whether the subject imports were a *substantial factor* in the injury to the

domestic industry, as opposed to a merely incidental, tangential, or trivial factor."  *Id*. at 879

(interpreting *Bratsk*, 444 F.3d at 1373) (citations & quotations omitted).  As the Federal Circuit,

as well as Commissioners Pearson and Okun, rightly note,

> interpreting *Bratsk* . . . as "a reminder that the [ITC], before it makes an affirmative
> determination, must satisfy itself that it has not attributed material injury to factors
> other than subject imports[]" is consistent with the [ITC's] obligation to "analyze the
> effects of the unfairly traded imports and other relevant factors in a way that enables
> the [ITC] to conclude that it has not attributed the effects of other factors to the
> subject imports."

*Id.* at 879 n.2 (citing Separate and Additional Views of Chairman Daniel R. Pearson and

Commissioner Deanna Tanner Okun Concerning *Bratsk Aluminum v. United States*, in *Sodium*

*Hexametaphosphate from China*, USITC Pub. No. 3912, No. 731-TA-1110 (Apr. 2007), at 21).

**B. The Application of the Non-subject Imports Analysis under *Gerald Metals* and *Bratsk* to Sunset Reviews**

The issue in *Mittal* was whether "the [ITC] was compelled by [the Federal Circuit's]

remand instructions and prior decisions . . . to conclude that [LTFV] imports of steel wire rod

from Trinidad and Tobago did not *cause* a material injury to a domestic industry." *Id.* at 869

(emphasis added). Defendant alleges that the court's opinion in *NSK* is manifestly erroneous and

significantly flawed in light of a change in the controlling law under *Mittal*. Specifically,

Defendant argues that the court (1) usurped the authority of the ITC by allegedly making factual

determinations on the triggering factors and (2) erred in its interpretation of *Bratsk*. However,

careful review and consideration of Defendant's motion does not convince the court of the

existence of significant flaw or manifest error in its previous order, nor of a miscarriage of

justice. For the following reasons, the analysis employed by the court in *NSK* is consistent with

the basic principles of *Bratsk* as clarified by the Federal Circuit in *Mittal*.

**1. The Triggering Factors**

In *Bratsk*, the Federal Circuit held that

[w]here commodity products are at issue in antidumping proceedings and fairly traded, price competitive, non-subject imports are in the market, the [ITC] must explain why the elimination of subject imports would benefit the domestic industry instead of resulting in the non-subject imports' replacement of the subject imports' market share without any beneficial impact on domestic producers.

*Bratsk*, 444 F. 3d at 1373 (citation omitted).  To trigger the non-subject import analysis under

*Bratsk*, (1) there must be a commodity product at issue and (2) price competitive non-subject

imports must be a significant factor in the U.S. market.  *See NSK*, 577 F. Supp. 2d at 1333 (citing

*Bratsk*, 444 F.3d at 1375).  Whether the triggering factors are present is a fact finding

responsibility delegated to the ITC, not this Court.  *See Mittal*, 542 F.3d at 875.  Defendant

complains that the court, and not the ITC, made factual findings on the triggering factors.  Def.

Br. 18-20.  At issue here is whether the court reviewed the facts on the record, or whether it

usurped the ITC's authority and made factual determinations.

 A literal reading of *NSK* may have led the Defendant to infer that the court assumed that

it, and not the ITC, is to make factual findings on the triggering factors.  The cause for confusion

may have been the court's statement that generally "*the court must determine*" whether the

triggering factors are present.  *See NSK*, 577 F. Supp. 2d at 1333 (emphasis added).  An

additional cause for the Defendant's concern may stem from the court's statement on the second

triggering factor that "*the court must examine*" whether non-subject imports represent a

significant factor in the U.S. market."  *Id*. at 1334 (emphasis added).  While the court commends

the Defendant's effort to proceed with scrupulous attention to the terms of the court's remand

instructions, no such inference is warranted.  Rather, the court in *NSK*, like the Federal Circuit in

*Bratsk*,[15] merely reviewed the record and based its holdings on the facts found by the ITC.

---

 [15] In *Bratsk*, the Federal Circuit noted that "[t]he antidumping investigation here revealed
the same conditions that triggered the causation inquiry in *Gerald Metals* . . . , as the [ITC] found
silicon metal generally interchangeable regardless of where it is produced."  444 F.3d at 1375.
The Federal Circuit also observed that "[n]on-subject imports were present . . . and [] a
significant factor in the U.S. market" because, "[a]s a percentage of total imports (by quantity),
non-subject imports accounted for approximately 79.6% in 1999, 82.6% in 2000, and 73% in

Regarding the first triggering factor, a commodity product is a good that is "generally interchangeable regardless of its source, . . . and subsequent cases have found a high level of fungibility between subject imports sufficient to trigger [the non-subject import analysis under] *Bratsk*." *Id.* at 1333 (citations & quotations omitted).  The record at issue here shows that the ITC found a high level of fungibility between subject imports and the domestic product, and between subject imports and imports from each of the other subject countries.  "Here, the ITC stated that the record indicates that the vast majority of purchasers consider ball bearings produced in France, Germany, Italy, Japan, and the United Kingdom to be substitutable for domestically produced ball bearings." *Id.* at 1334 (citing *Confidential Views* ("*CV*") at 49) (brackets & quotations omitted).  Moreover, the record also noted that "70 out of 77 responding purchasers and 81 out of 125 responding importers considered domestically produced ball bearings and the subject merchandise to be always or frequently interchangeable." *Id.* (citation & quotations omitted). The court did not itself make factual determinations, but rather relied on the ITC's record as the basis for its legal conclusion.  Given the data in the record, the court properly concluded that the record demonstrates that the subject ball bearings were "sufficiently fungible to satisfy the 'commodity product' test under *Bratsk*."[16] *Id.* (citing *Bratsk*, 444 F.3d at 1375).

---

2001." *Id.*  As a result, the Federal Circuit remanded the investigation to the ITC to perform the non-subject import analysis under *Bratsk*.

[16] We are guided by the Federal Circuit, which has held that interchangeability between subject imports and the domestic product, and among the subject imports themselves, is sufficient fungibility to trigger the non-subject import analysis.  *See Caribbean Ispat Ltd. v. United States*, 450 F. 3d 1336, 1341 (Fed. Cir. 2006).

On the second triggering factor, the court noted the similarities between the facts in

*Bratsk* related to the percentage amount of non-subject imports in the marketplace and the ITC's

factual determinations here on the issue of whether non-subject imports are a significant factor in

the U.S. market. The court observed that here "non-subject imports of ball bearings (by quantity)

accounted for 63.5 percent in 2003, 68.7 percent in 2004, and 70.3 percent in 2005," and in

*Bratsk* "non-subject imports accounted for approximately 79.6% in 1999, 82.6% in 2000, and

73.0% in 2001 . . . ." *Id.* (citations omitted). In addition, the record shows that the ITC found the

global market for the merchandise at issue to be price competitive. *See Staff Report* at Overview-

8, TRB-I-16, BB-I-39, SPB-I-10. Because the court relied on facts found by the ITC, the court

properly reasoned that the record makes clear that the non-subject imports are price competitive

and a significant factor in the domestic industry.

Finally, the court recognizes that

> each injury . . . is *sui generis*, involving a unique combination and interaction of
> many economic variables; and consequently, a particular circumstance in a prior
> [proceeding] cannot be regarded by the [ITC] as dispositive of the determination
> in a later [proceeding].

*USEC, Inc. v. United States*, 25 CIT 49, 132 F. Supp. 2d 1, 14 (2001) (citation & quotations

omitted). However, while each sunset review must be based on the particular set of facts before

the ITC, "the ITC may not disregard previous findings of a general nature that bear directly upon

the current review." *Usinor*, 26 CIT at 792. In some cases where the record is otherwise unclear

or ambiguous, it may be difficult for the parties to discern whether the court reviewed an agency

record or overreached its authority and made factual findings. Certainly to alleviate such

concerns in the future, the ITC in its role as the finder of facts in antidumping proceedings has

the discretion and is best suited to determine whether it will employ a bright line rule in

subsequent cases, and, in addition or in the alternative, put its factual conclusions on the

triggering factors clearly and unambiguously in the record.

    In sum, here the court did not usurp the ITC's authority. Rather, the court merely

reviewed the factual findings of the ITC and observed the presence of the triggering factors in

light of the record. That there were significant similarities between *Bratsk* and the case at bar

also compelled the court to remand the case with instructions to the ITC to conduct a non-subject

import analysis and directly address the impact of non-subject imports on the domestic industry.

### 2. The Non-subject Import Analysis

    Taking into account the structure and context of the opinion, the court understands *Mittal*

to merely clarify the causation analysis required of the ITC in antidumping cases. In Section II of

the *Mittal* opinion, the Federal Circuit first discusses general causation principles in antidumping

cases and its application of those principles to investigations first in *Gerald Metals* and

subsequently in *Bratsk*. *See Mittal*, 542 F.3d at 872-74. In the remainder of its opinion, the

Federal Circuit focuses on the ITC's misinterpretation of those general causation principles as

they were applied by the ITC in that case, an investigation. *Id.* at 874-79. Specifically, the

Federal Circuit states that judicial review of the ITC's "causation analysis in antidumping cases

is limited to whether the [ITC] complied with [(1)] certain minimum requirements imposed by

statutory provisions and [(2)] principles of administrative law." *Id.* at 873. Regarding its

obligation to comport with administrative law, the Federal Circuit notes that the ITC is afforded

great discretion and "is not required to follow a single methodology for making [the causation]

determination." *Id.* However, the ITC abuses that discretion if, "by ignoring a relevant

economic factor that it could consider . . . , [it] entirely fail[s] to consider an important aspect of

the problem." *See id*. at 873-74 (citations & quotations omitted). This broad language employed

by the Federal Circuit generally outlines the ITC's duties in antidumping proceedings and

suggests to the court that the focus of the opinion in *Mittal* was to clarify and crystalize the

previously unsettled law on "causation". *See Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

However, Defendant argues that the court erred in its interpretation of *Bratsk* in light of

*Mittal* in several respects. First, Defendant argues that the following passage and emphasized

text demonstrate the Federal Circuit's intent of limiting *Bratsk* to injury investigations:

> An important element of the causation inquiry—not necessarily dispositive, but
> important—is whether the subject imports are the "but for" cause of the injury to the
> domestic industry. . . . In this context, that principle requires the finder of fact to ask
> whether conditions would have been different for the domestic industry in the
> absence of dumping. Thus, *Bratsk* (like *Gerald Metals*) directs that in cases
> involving commodity products in which non-LTFV imported goods are present in the
> market, the [ITC] must give consideration to the issue of "but for" causation by
> considering whether the domestic industry would have been better off if the dumped
> goods had been absent from the market. That inquiry is *not concerned with whether*
> *an antidumping order would actually lead to the elimination of those goods from the*
> *market in the future or whether those goods would be replaced by goods from other*
> *resources*. Rather, the inquiry is a hypothetical one that sheds light on whether the
> injury to the domestic industry can be reasonably attributed to the subject imports.
> The focus of the inquiry is on the cause of injury in the past, *not the prospect of*
> *effectiveness in the future*.

Def. Br. 13-14 (citing *Mittal*, 542 F.3d at 876 (emphasis added)). Contrary to the Defendant's

claim, the Federal Circuit did not expressly reject the application of *Bratsk* to sunset reviews in

*Mittal*. Defendant's confusion begins with its misunderstanding of the subject of the cited

passage.  Here, the topic sentence concerns the causation analysis in antidumping proceedings and, specifically, the "but for" cause analysis in antidumping investigations, not the application of the non-subject import analysis as employed by the Federal Circuit in *Bratsk*.  The phrase "that inquiry" in the second sentence of the cited paragraph speaks to the "but for" cause analysis as part of the greater causation inquiry in an antidumping investigation.  If the terms "that inquiry" referred to the application of the *Bratsk* case itself, the third and final sentences of the cited passage would have no meaning.

Moreover, a careful reading of the passage cited by Defendant demonstrates that the concern of the Federal Circuit in that section is with the misapprehension that *Bratsk* requires the ITC to focus on the effectiveness of the antidumping order, rather than on the underlying cause of the injury.  Indeed, the Federal Circuit expressly states that the ITC misread *Bratsk* as allowing an antidumping duty order to be entered only if the order would be "*'effective'* in the future by causing the elimination of the subject imports from the market, which imports would not then be replaced by non-subject imports."  *Mittal*, 542 F.3d at 876 (emphasis added).  Clarifying its opinion, the Federal Circuit emphasizes that "the decision in *Bratsk* was not addressed to the potential effectiveness of any possible remedial order.  Instead, it was directed to determining the *cause* of the injury already suffered by the domestic industry."  *Id*. (emphasis added).  That the central focus of *Mittal* is on the issue of causation is also buttressed by the Federal Circuit's additional discussion of an important component of the "causation inquiry" in the context of an investigation: whether subject imports are the "but for" cause of the injury to the domestic industry.  *See id*. at 875-77.

Second, Defendant argues that the court erred when it found that *Bratsk* required the ITC to examine the "*effectiveness* of the underlying antidumping order in relation to fundamental changes in the marketplace that might be more likely to cause injury to the domestic industry than unrestrained subject imports.'" Def. Br. 14 (quoting *NSK*, 577 F. Supp. 2d at 1333). As previously noted, the Federal Circuit emphasized that the proper focus of the ITC's inquiry is on the *cause* of the injury, not on the effect of the antidumping order. *See Mittal*, 542 F.3d at 875-77. Defendant misreads the court's opinion in *NSK,* which does not ask the ITC to focus on the effectiveness of the antidumping duty. Defendant's confusion likely is a result of its failure to consider the restrictive clause of the sentence at issue. Without the restrictive clause, which requests the ITC to examine "fundamental changes in the marketplace that might be more likely to cause injury to the domestic industry than unrestrained subject imports," the court's instruction to consider the effect of the order is otherwise meaningless. The thrust of the court's order is in the restrictive clause because it requires the ITC to ensure that (1) the subject imports would likely be the cause of injury to the domestic industry and (2) the effect of the order would be to address the injury from the subject imports likely to be suffered.

Third, *Mittal* does not limit *Bratsk* to retrospective causation analyses. Defendant argues that *Mittal* is colored with language that underlines the Federal Circuit's view that *Bratsk* is limited to backward-looking analyses. Def. Br. 14-15. Specifically, Defendant notes that the Federal Circuit explained *Bratsk* was "*not* addressed to the potential effectiveness of any possible remedial order" but was instead "directed to determining the cause of *the injury already suffered* by the domestic industry." *Mittal*, 542 F.3d at 876 (emphasis added). Similarly, Defendant

points to the Federal Circuit's statement that "[t]he focus of the [*Bratsk*] inquiry is *on the cause of injury in the past*, not the prospect of effectiveness in the future." *Id*. (emphasis added). Defendant misunderstands the paragraphs at issue, which focus principally on the causation inquiry, and not on the analysis employed by the court in *Bratsk*. Indeed, the Federal Circuit begins the second cited paragraph with the explanation that an "important element of the causation inquiry . . . is whether the subject imports are the 'but for' cause of the injury to the domestic industry." *Id.*

Further, Defendant's reliance on the Federal Circuit's use of terms of art that correspond to injury investigations is also misplaced. Defendant argues that because *Mittal* speaks only to retrospective causation analyses, the application of *Bratsk* by the court to prospective analyses like those in a sunset review is illogical. *Mittal* concerned the application of the non-subject import analysis prescribed by *Gerald Metals* and *Bratsk* to an injury investigation. *See id.* at 869-72. That the Federal Circuit uses language to discuss causation principles in the setting of an investigation does not mean those principles are inapplicable to a sunset review. However, even if the text is as limiting as Defendant reads it to be, the cited language would only indirectly suggest that *Bratsk* should be limited to investigations. The court cannot accept that with a single paragraph the Federal Circuit would foreclose the application of *Bratsk* to sunset reviews without expressly and affirmatively stating that conclusion.

To be sure, *Mittal* neither expressly extends or rejects the application of *Bratsk* to threat analyses or sunset reviews. However, Defendant relies on the following passage to argue that *Bratsk* does not apply to threat analyses and, thus, sunset reviews:

> In its decision, the [ITC] noted that our opinion in *Bratsk* did not mention whether replacement of LTFV subject imports by nondumped imports is a factor that should be considered in threat determinations.  Nonetheless, the [ITC] declined to issue an affirmative determination as to the threat of material injury to the domestic industry based on *the presumption* that nondumped imports would have replaced the LTFV subject imports from Trinidad and Tobago.  Because *that analysis* was not required by our decision in *Bratsk* and our prior decision in this case for the reasons discussed, we vacate the judgment of the [USCIT] and remand for further proceedings with respect to the threat of material injury as well.

*Id.* at 879 (emphasis added).  Here, however, the Federal Circuit merely observed that the ITC's negative threat determination stemmed from its improper use of a presumption that non-dumped imports would have replaced subject imports.  Earlier in its opinion, the Federal Circuit discussed and expressly rejected the use of such a presumption in material injury determinations.  *See id.* at 877.  The proper reading of the above passage is that the Federal Circuit rejected the use of the presumption that it discounted earlier in its opinion, and not that it dismissed the idea that *Bratsk* applies to a determination of threat of material injury.  Thus, *Mittal* does not prevent this court from holding that the non-subject import analysis is proper in a sunset review when the triggering factors are present.

Finally, the court maintains that a non-subject import analysis is a required step in establishing "causation" under § 1675a(a)(1) when the "same conditions as were present in *Bratsk* are present in the case at bar."  *NSK*, 577 F. Supp. 2d at 1332 n.9, 1333.  Defendant interprets the opinion in *NSK* to require the ITC to analyze whether non-subject imports have replaced or are likely to replace the subject imports in the domestic market, irrespective of whether the triggering factors are present.  Def. Br. 11.  The Defendant misreads the court's holding, which specifically states

>whenever a sunset review is centered on [(1)] a commodity product, and [(2)] price competitive non-subject imports are a significant factor in the market, the ITC must consider whether non-subject imports have captured or are likely to capture market share previously held by subject imports, and whether this level of displacement makes it unlikely that removal of the orders will lead to a continuation or recurrence of material injury as a result of subject imports.

*NSK*, 577 F. Supp. 2d at 1333 (brackets, citations & quotations omitted).  The holding in *NSK* is clear that the central precondition to the application of the non-subject import analysis as part of the causation inquiry in the context of a sunset review is the presence of (1) a commodity product and (2) price competitive non-subject imports that are a significant factor in the market.  If and when those conditions are present, the court holds that the ITC must engage in such an analysis as first stated in *Gerald Metals* and *Bratsk,* and later clarified by the Federal Circuit in *Mittal*.

### IV. Conclusion

The court finds that there is no significant flaw or manifest error in its reading of § 1675a or the requirements of the non-subject import analysis under *Bratsk* in light of *Mittal* and, thus, there is no miscarriage of justice here.  For the reasons discussed herein, Defendant and Defendant-Intervenor's Motions for Rehearing are denied.  Accordingly, it is hereby

ORDERED that the ITC shall have until May 4, 2009 to file its remand results with the Court.  Plaintiffs, Plaintiff-Intervenors and Defendant-Intervenors shall file their responses no later than June 22, 2009.

Dated:  December 29, 2008                                      /s/ Judith M. Barzilay

New York, NY                                            Judge Judith M. Barzilay

## NOTICE OF ENTRY AND SERVICE


This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.


Tina Potuto Kimble
Clerk of the Court


Date: _____     By: _____
                                                                    Deputy Clerk