Slip Op. 09-91

## UNITED STATES COURT OF INTERNATIONAL TRADE

———————————————————————
                                                   :
NSK CORPORATION, *et al.*,                         :
                                                   :
            Plaintiffs,                            :
                                                   :
            and                                    :
                                                   :
FAG ITALIA SpA, *et al.*,                          :
                                                   :
            Plaintiff-Intervenors,                 :
                                                   :   **Before: Judith M. Barzilay, Judge**
            v.                                      :   **Consol. Court No. 06-00334**
                                                   :
UNITED STATES,                                     :
                                                   :
            Defendant,                             :
                                                   :
            and                                    :
                                                   :
THE TIMKEN COMPANY,                                :
                                                   :
            Defendant-Intervenor.                  :
———————————————————————:

## <u>OPINION & ORDER</u>

[Defendant's Remand Determination is not supported by substantial evidence or in accordance with law and is, therefore, remanded.]

Dated:  August 31, 2009

*Crowell & Moring LLP* (*Matthew P. Jaffe*, *Robert A. Lipstein*, and *Carrie F. Fletcher*), for Plaintiffs NSK Corporation, NSK Ltd., and NSK Europe Ltd.

*Sidley Austin LLP* (*Neil R. Ellis* and *Jill Caiazzo*), for Plaintiffs JTEKT Corporation and Koyo Corporation of U.S.A.

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP* (*Max F. Schutzman* and *Andrew T. Schutz*), for Plaintiff-Intervenors FAG Italia SpA, Schaeffler Group USA, Inc., Schaeffler KG, The Barden Corporation (U.K.) Ltd., and The Barden Corporation.

*Steptoe & Johnson* (*Herbert C. Shelley*, *Alice A. Kipel*, and *Susan R. Gihring*), for Plaintiff-Intervenors SKF Aeroengine Bearings UK and SKF USA, Inc.

*United States International Trade Commission*, *James M. Lyons* (General Counsel), *Neal J. Reynolds* (Assistant General Counsel for Litigation), *David A.J. Goldfine*, and *Mark B. Rees*, Office of the General Counsel, for Defendant United States.

*Stewart and Stewart* (*Terence P. Stewart*, *Eric P. Salonen*, and *Elizabeth A. Argenti*), for Defendant-Intervenor The Timken Company.

    **BARZILAY, JUDGE**:  This case returns to the court following the U.S. International

Trade Commission's ("ITC") remand determination on the second five-year, or "sunset," review

of certain antidumping duty orders covering ball bearings from Japan and the United Kingdom.[1]

*Certain Ball Bearings and Parts Ther*[*e*]*of from Japan and the United Kingdom*, USITC Pub.

4082, Inv. Nos. 731-TA-394-A, 731-TA-399-A (May 2009), *available at*

http://www.usitc.gov/publications/701_731/pub4082.pdf ("*Remand Determination*").  In *NSK*

*Corp. v. United States*, 32 CIT ___, 577 F. Supp. 2d 1322 (2008) ("*NSK I*"), and as further

clarified by *NSK Corp. v. United States*, 32 CIT ___, 593 F. Supp. 2d 1355 (2008) ("*NSK II*"),

the court affirmed in part, and remanded in part, the ITC's second sunset review of the subject

antidumping duty orders.  The focus of the three issues remanded to the ITC centered on the

presence and effect of significant numbers of non-subject imports in the domestic market and the

effect of significant restructuring in the domestic ball bearing industry.  Upon consideration of

---

    [1] The ITC is an independent federal agency of Defendant United States that is responsible for making the determination that is the subject of this dispute.

the court's remand instructions in the two cited cases, the ITC again determined that revocation

of the antidumping duty orders would be likely to lead to continuation or recurrence of material

injury to the domestic industry within a reasonably foreseeable time.[2] *Remand Determination* at

1.  Plaintiffs NSK Corporation, NSK Ltd., NSK Europe Ltd. (together, "NSK"),[3] along with

JTEKT Corporation and Koyo Corporation of U.S.A. (collectively, "JTEKT"),[4] challenge the

ITC's remand determination, arguing that it is unsupported by substantial evidence and not in

accordance with law.  The court finds that the ITC's remand determination is neither supported

by substantial evidence or in accordance with law for the reasons explained herein, and therefore

remands the case to the agency for a second time to conduct further proceedings consistent with

this opinion.

## I.  Background

### A.  The Role of the U.S. International Trade Commission in a Sunset Review

Every five years following the initial publication of an antidumping duty order, the U.S.

Department of Commerce ("Commerce") and the ITC must conduct a sunset review.  19 U.S.C.

---

[2] Defendant-Intervenor The Timken Company ("Timken"), who joins this proceeding as a matter of right under USCIT Rule 24, agrees with the ITC's final results described in the *Remand Determination*.

[3] NSK Corporation is a U.S. company that produces ball bearings domestically and imports these products from its sister companies – NSK Ltd., a Japanese corporation, and NSK Europe Ltd., a British corporation.  NSK Ltd. is a party to the present action, while NSK Europe Ltd. is a party in Court No. 06-00336, which joins this case pursuant to USCIT R. 42(a).

[4] JTEKT Corporation is a Japanese manufacturer and exporter of ball bearings, and Koyo Corporation of U.S.A. is a domestic importer of such products.  Both JTEKT Corporation and Koyo Corporation of U.S.A. are plaintiffs in Court No. 06-00335, a case that the court consolidated with the action here.  USCIT R. 42(a).

§ 1675(c).  More specifically, for an antidumping duty order to remain in effect, (1) Commerce

must affirmatively determine that dumping of the subject merchandise "would be likely to

continue or recur," and (2) the ITC must similarly find that the subject imports would be likely to

continue or cause material injury to the domestic industry in the absence of the antidumping duty

order.  § 1675(d)(2).  In other words, the central task of the ITC in a sunset review is to

determine whether the subject merchandise would likely continue to materially injure or cause

material injury to the domestic industry if Commerce revoked the antidumping duty order.

§ 1675(d)(2)(B).  To make a proper injury determination, the ITC must "consider the likely

volume, price effect, and impact of imports of the subject merchandise on the [domestic] industry

if the order is revoked . . . ."  19 U.S.C. § 1675a(a)(1).  The ITC must weigh numerous factors in

making that determination, including

> (A) its prior injury determinations, including the volume, price effect, and impact
> of imports of the subject merchandise on the industry before the order was
> issued . . . ,
> (B) whether any improvement in the state of the industry is related to the
> order . . . ,
> (C) whether the industry is vulnerable to material injury if the order is
> revoked . . . , and
> (D) in an antidumping proceeding under [§ 1675(c)] . . . , the findings of
> [Commerce] regarding duty absorption under [§ 1675(a)(4)] . . . .

§ 1675a(a)(1)(A)-(D).  While the ITC must consider all of the factors enumerated in the statute,

no one factor is necessarily dispositive:

> [t]he presence or absence of any factor which the [ITC] is required to consider
> under [§ 1675a(a)] shall not necessarily give decisive guidance with respect to the
> [ITC's] determination of whether material injury is likely to continue or recur
> within a reasonably foreseeable time if the order is revoked . . . .  In making that
> determination, the [ITC] shall consider that the effects of revocation . . . may not
> be imminent, but may manifest themselves only over a longer period of time.

§ 1675a(a)(5).

**B.  The Original Antidumping Duty Order & Subsequent Reviews**

In 1989, Commerce issued an antidumping duty order covering ball bearings from, among other nations, Japan and the United Kingdom.  *Antidumping Duty Orders: Ball Bearings, Cylindrical Roller Bearings, and Spherical Plain Bearings and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand, and the United Kingdom*, 54 Fed. Reg. 20,900, 20,900-911 (Dep't Commerce May 15, 1989).  The ITC initiated the first set of sunset reviews pursuant to § 1675(c) in 1999, with the agency ultimately determining that the revocation of the antidumping duty orders would likely lead to continuation or recurrence of material injury to the U.S. ball bearing industry.  *See Continuation of Antidumping Duty Orders: Certain Bearings From France, Germany, Italy, Japan, Singapore, the United Kingdom, and the People's Republic of China*, 65 Fed. Reg. 42,665, 42,665 (Dep't Commerce July 11, 2000).  In June 2005, the ITC automatically initiated a second sunset review of the antidumping duty orders.  *See Certain Bearings From China, France, Germany, Italy, Japan, Singapore, and the United Kingdom*, 70 Fed. Reg. 31,531, 31,532 (ITC June 1, 2005). Approximately one year later, the ITC made an affirmative determination that the revocation of the antidumping duty orders would likely lead to continuation or recurrence of material injury to the domestic industry.  *Certain Bearings From China, France, Germany, Italy, Japan, Singapore, and the United Kingdom*, 71 Fed. Reg. 51,850, 51,850 (ITC Aug. 31, 2006). Plaintiffs NSK and JTEKT thereafter filed suit to challenge the final results of the second sunset review.

## C.  Procedural History

In *NSK I*, the court affirmed in part, and remanded in part, the ITC's second sunset determination.  32 CIT ___, 577 F. Supp. 2d 1322.  Specifically, the court ordered the ITC to address three issues on remand.  First, the court directed the ITC to reevaluate whether the revocation of the antidumping duty order would be likely to lead to continuation or recurrence of material injury to the domestic industry given the significant presence of non-subject imports in the domestic market.  *Id.*, 32 CIT at ___, 577 F. Supp. 2d at 1330-34.  The core of that instruction directed the ITC to reconsider whether, in light of the significant presence of non-subject imports, the subject imports are more than a mere tangential factor in the material injury to the domestic industry that is likely to continue or recur in the absence of the antidumping duty order.  *See id*.  Second, the court instructed the ITC to reassess the supply conditions within the domestic market, with a particular eye towards reexamining the agency's vulnerability and impact findings given the significant restructuring within the global ball bearing industry.  *Id.*, 32 CIT at ___, 577 F. Supp. 2d at 1338-39.  Finally, the court directed the ITC to reconsider its discernible adverse impact analysis and decision to cumulate ball bearings from the United Kingdom with other subject imports because the agency's analysis on this issue was incomplete without a more scrupulous examination of the significant rise in non-subject imports and the large-scale restructuring within the ball bearing industry.  *Id.*, 32 CIT at ___, 577 F. Supp. 2d at 1337-38.

In *NSK II*, Defendant and Defendant-Intervenor asked the court to reconsider its decision in *NSK I* in view of an alleged change in the controlling law – *Mittal Steel Point Lisas Ltd. v.*

*United States*, 542 F.3d 867 (Fed. Cir. 2008) ("*Mittal*"). 32 CIT ___, 593 F. Supp. 2d 1355. In response, the court first explained in detail the statutory demands placed on the ITC in a sunset review by §§ 1675(c) and 1675a(a). *Id.*, 32 CIT at ___, 593 F. Supp. 2d at 1363-67. Sections 1675(c) and 1675a(a) focus on the issue of causation in a sunset review, and the court noted that the central task for the ITC is to discern "whether the subject imports themselves would be a substantial factor in the cause of injury to the domestic industry, rather than some secondary, 'merely incidental, tangential, or trivial factor.'" *Id.*, 32 CIT at ___, 593 F. Supp. 2d at 1364-65 (citation omitted). That obligation, however, does not mean that the ITC must "identify and analyze every factor that could potentially cause injury to the domestic industry [or] determine that the subject merchandise is the 'sole or principal cause of injury.'" *Id.*, 32 CIT at ___, 593 F. Supp. 2d at 1365 (citation omitted). In carefully expounding the agency's duty, the court plainly emphasized that

> the ITC is not required "to address the causation issue in any particular way, or to apply a presumption that non-subject producers would have replaced the subject imports if the subject imports had been removed from the market." *Mittal*, 542 F.3d at 878 (footnote omitted). Rather, the primary responsibility of the ITC is "to consider the causal relation between the subject imports and the injury to the domestic industry . . . ." *Id.* at 877 (explaining that [*Bratsk Aluminum Smelter v. United States*, 444 F.3d 1369 (Fed. Cir. 2006) ("*Bratsk*")] does not require the ITC to employ a presumption that non-subject goods would replace subject goods if the subject goods were removed from the market). The ITC is simply required "to give full consideration to the causation issue and to provide a meaningful explanation of its conclusions." *Id.* at 878 (citation omitted). The ITC fulfills its statutory duty by determining "whether the subject imports were a *substantial factor* in the injury to the domestic industry, as opposed to a merely incidental, tangential, or trivial factor." *Id.* at 879 (interpreting *Bratsk*, 444 F.3d at 1373) (citations & quotations omitted).

*Id.*, 32 CIT at ___, 593 F. Supp. 2d at 1366.  The court went on to state that the Federal Circuit's

opinion in *Mittal* did not constitute an intervening change in the controlling law.  *Id.*, 32 CIT at

___, 593 F. Supp. 2d at 1367-72.  Importantly, the ITC's discussion of the court's holdings in

*NSK II* in its remand analysis is noticeably scant.

## II.  Subject Matter Jurisdiction & Standard of Review

Pursuant to 28 U.S.C. § 1581(c), the Court has exclusive jurisdiction over any civil action

commenced under section 516A of the Tariff Act of 1930, codified as amended at 19 U.S.C.

§ 1516a, which provides for judicial review of, among other proceedings, a sunset review.

§ 1516a(a)(2)(B)(iii).  In reviewing one of the ITC's sunset determinations, the Court will hold

unlawful any determination that is "unsupported by substantial evidence on the record, or

otherwise not in accordance with law."  § 1516a(b)(1)(B)(i).

An agency supports its determination and the findings therein with substantial evidence

when the record contains "more than a mere scintilla" of proof that demonstrates to the court that

a reasonable mind might accept the relevant evidence as adequate to support the conclusion.

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  The mere assertion of evidence which

in and of itself justifies the agency's determination does not satisfy the substantial evidence

standard.  *See Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) ("*Gerald

Metals*").  To provide the requisite support, the agency must offer more than conjecture and

reasonably explain the basis for its decisions.  *See NMB Singapore Ltd. v. United States*, 557

F.3d 1316, 1319-20 (Fed. Cir. 2009) (citation omitted).  "[W]hile [the agency's] explanations do

not have to be perfect, the path of [its] decision must be reasonably discernible to a reviewing

court." *NMB Singapore Ltd.*, 557 F.3d at 1319-20 (citation omitted).  Importantly, at a

minimum, a determination must necessarily include an explanation of the standards applied and

the analysis leading to the conclusion, thereby demonstrating a rational connection between the

facts on the record and the conclusions drawn.  *See Matsushita Elec. Indus. Co., Ltd. v. United

States*, 750 F.2d 927, 933 (Fed. Cir. 1984).  That there may be two inconsistent conclusions

drawn from the evidence "does not prevent an administrative agency's finding from being

supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)

(citations omitted).  Even where there are two fairly conflicting views in the record, the court

must not displace the agency's choice for its own had the matter been before the bar de novo.

*See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).  However, the agency's

discretion is not unbounded, and the court will not accept a determination that "entirely fail[s] to

consider an important aspect of the problem . . . ." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.

State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

      An agency determination is in accordance with law when that decision is constitutional,

and not contrary to statute, regulation, precedent, or procedures.  *See FCC v. NextWave Pers.

Commc'ns Inc.*, 537 U.S. 293, 300 (2003).  The failure of an agency to candidly comply with the

instructions in a remand order not only shows a disregard for the issuing court's authority, but it

is also an act that is contrary to law.  *See, e.g., Smith Corona Corp. v. United States*, 915 F.2d

683, 688 (Fed. Cir. 1990) (noting that a decision of the Court has controlling effect when

rendered).

### III.  Discussion

Plaintiffs NSK and JTEKT contend that the ITC's analysis of the issues on remand is not supported by substantial evidence nor in accordance with law.[5]  The court's opinions in *NSK I* and *NSK II* effectively remanded three issues to the agency to reconsider.  In examining the *Remand Determination* under the applicable standard of review, the court finds that the agency's determinations here do not pass muster because the ITC failed to (1) fully comport with the court's remand instructions and (2) meaningfully demonstrate a rational connection between the facts in the record and the conclusions reached.

### A.  The Causation Inquiry & the Analysis of Non-Subject Imports

On remand, Defendant reaffirmed its original position that "revocation of the antidumping duty orders covering ball bearings from Japan and the United Kingdom is likely to result in the continuation or recurrence of material injury by reason of subject imports."  *Remand Determination* at 37.  Plaintiff JTEKT argues that another remand is needed so that the ITC may fully address the impact of the non-subject imports on the U.S. market.  JTEKT alleges that the ITC acted contrary to law by not addressing the fundamental concerns of the court's remand instructions.  JTEKT Comments at 2-3, 8-9, 27.  Moreover, JTEKT claims that the agency failed to adequately consider certain data that is outcome determinative.  JTEKT Comments at 8-27.

---

[5] NSK's comments on the *Remand Determination* focus exclusively on two of the remanded issues – the likely impact of the subject imports and the supply conditions therein, and the cumulation of ball bearings from the United Kingdom with other subject imports – whereas JTEKT's comments center on the issue of causation and the role of non-subject imports.  NSK incorporates by reference JTEKT's comments on the issue of causation and non-subject imports, while JTEKT adopts NSK's comments on the ITC's decision to cumulate the subject imports. NSK Comments at 30-31; JTEKT Comments at 3 n.2.  JTEKT takes no position on the ITC's reassessment of its vulnerability and impact findings.  JTEKT Comments at 3 n.2.

The ITC acted contrary to law when it failed to genuinely comply with the court's remand

instructions.  The agency dedicates nearly a third of its remand analysis to vociferously disagree

with the court's holding in *NSK I*.[6]  *Remand Determination* at 4-17.[7]  More specifically, the ITC

argues that the non-subject import analysis is limited to original injury investigations and other

similar retrospective inquiries on causation.  *Id*. at 9-11.  In the ITC's interpretation, the Federal

Circuit in *Mittal* ruled that the non-subject import analysis does not apply to a "prospective

replacement analysis" like that in a sunset reviews.  *Id*. at 10.  Finally, notwithstanding the

court's holding in *NSK II*, the agency also alleges that the court unlawfully forced it to perform a

replacement/benefit test on remand – an examination that the ITC calls the "market share

replacement analysis" and which it alleges is similar in kind to one described as unlawful by the

Federal Circuit.  *See id*. at 7, 11-12 (citing *Mittal*, 542 F.3d at 879).[8]

---

[6] As part of its discussion, Defendant cites to *Nucor Corp. v. United States*, 32 CIT ___, 594 F. Supp. 2d 1320 (2008).  In that decision, the Court found that the ITC need not conduct a non-subject import analysis in a sunset review when certain factual conditions are present, noting that the Federal Circuit has apparently limited the agency's use of said analysis to original injury investigations.  *Nucor Corp.*, 32 CIT at ___, 594 F. Supp. 2d at 1380.  However, the Court stated that its decision "should not be read to provide the [ITC] license to unilaterally disregard data related to non-subject imports during a sunset review" and may consider that information in its analysis "if it finds that such imports are a 'relevant economic factor [ ]' to its determination" under § 1675a(a)(2) and (a)(4).  *Id*., 32 CIT at ___, 594 F. Supp. 2d at 1382.  This court disagrees with the analysis in *Nucor Corp.* on this issue for the reasons explained in *NSK I* and *NSK II*.

[7] The court expects that the ITC will not repeat these arguments in its next remand determination as they are more properly directed to the Federal Circuit.

[8] The ITC also disagrees with the court's consideration of the factual conditions that triggered the non-subject imports analysis, an issue that is outside the scope of the remand instructions and one that the court will not address here.  *Id*. at 14-17.

The relevant statutes that describe the ITC's task in a sunset review clearly contain an

element of causation, a point that is reaffirmed by the Court's precedent and which Defendant

acknowledges in the *Remand Determination*.  §§ 1675(c), 1675a(a); *see also Usinor v. United

States*, 26 CIT 767 (2002) (not reported in F. Supp.); *Neenah Foundry Co. v. United States*, 25

CIT 702, 155 F. Supp. 2d 766 (2001); *Titanium Metals Corp. v. United States*, 25 CIT 648, 155

F. Supp. 2d 750 (2001).  Equally important here is the doctrine of *stare decisis*, which states that

"when [a] court has once laid down a principle of law as applicable to a *certain state of facts*, it

will adhere to that principle, and apply it to all future cases, where *facts are substantially the

same . . . .*"  BLACK'S LAW DICTIONARY 1406 (6th ed. 1990) (emphasis added).  Of paramount

concern in *Gerald Metals*, *Bratsk*, *Mittal* and *NSK I* was whether the subject imports were the

cause of injury, or would cause continuation or recurrence of injury, to the domestic industry.

The causation analysis in *Gerald Metals*, *Bratsk*, and *Mittal* involved commodity products in

which fairly-traded, price competitive non-subject imports were a significant factor in the market,

facts which are substantially similar to those before the court in this action.[9]  *Mittal*, 542 F.3d at

870-71; *NSK I*, 32 CIT at ___, 577 F. Supp. 2d at 1333-34; *Bratsk*, 444 F.3d at 1373-76; *Gerald

Metals*, 132 F.3d at 720-23.  Guided by its analysis of the pertinent statutes and by its

understanding of the obligations charged to the ITC in light of the controlling precedent, the

court held that the agency could not justify its affirmative determination on the causation issue

without a more thorough examination of non-subject imports.  *NSK I*, 32 CIT at ___, 577 F.

---

[9] A "commodity product" is a good that is "generally interchangeable regardless of its
source."  *Bratsk*, 444 F.3d at 1371.

Supp. 2d at 1330-33.  Regardless of its view on the validity *vel non* of every decision from the

bench, the agency must nevertheless fully comply with a court's remand instructions.  *Smith*

*Corona Corp.*, 915 F.2d at 688.

The court acknowledges that its remand instructions in *NSK I* on the causation issue may

have provided the ITC with some confusion.  However, the court alleviated any such uncertainty

when it issued *NSK II*.  Defendant had asked the court to reconsider its opinion in *NSK I* in light

of *Mittal*.  In *NSK II*, the court thoroughly examined the obligations that Congress imposed on

the ITC in a sunset review.  32 CIT at ___, 593 F. Supp. 2d at 1363-1372.  The court made clear

that "the only duty imposed on the ITC is to ensure that the subject imports, and not non-subject

imports or some other factor, would be substantially responsible for injury to the domestic

industry."  *Id.*, 32 CIT at ___, 593 F. Supp. 2d at 1365.  Critically, the court explicitly

emphasized that it does not require the ITC to conduct its causation inquiry in any particular

manner, and reaffirmed that completing a more thorough analysis of non-subject imports would

not force "the ITC to adopt[] a rigid 'benefit' analysis or sacrifice discretion in determining the

likelihood of material injury under § 1675a(a)," a statement Defendant altogether ignores in the

*Remand Determination*.[10]  *Id.*, 32 CIT at ___, 593 F. Supp. 2d at 1360 (citing *NSK I*, 32 CIT at

_____

[10] The ITC also argues that §§ 1675(c) and 1675a(a) are ambiguous as to whether the ITC
must perform a replacement/benefit test, and therefore the court must afford deference to the
agency to interpret the statute as it pleases given that "'a court's choice of one reasonable reading
of an ambiguous statute does not preclude an implementing agency from later adopting a
different reasonable interpretation.'"  *Remand Determination* at 13 (citing *United States v.
Eurodif S.A.*, 129 S. Ct. 878, 886 (2009)).  Despite Defendant's assertions to the contrary, the
court did not prescribe a Procrustean formula for the ITC to follow, but rather noted that the
agency could not conduct a meaningful inquiry on the issue of causation without a more thorough
examination of non-subject imports.  *NSK II*, 32 CIT at ___, 593 F. Supp. 2d at 1359-60 (citing
*NSK I*, 32 CIT at ___, 577 F. Supp. 2d at 1333).  Moreover, there is nothing ambiguous about the

___, 577 F. Supp. 2d at 1333); *see also id.*, 32 CIT at ___, 593 F. Supp. 2d at 1366 (emphasizing that the ITC does not need to address the causation inquiry in any particular way).  It is of great concern that, after asking the court to reconsider its opinion in *NSK I*, the ITC rarely cites to, let alone significantly discusses, the analysis of this issue in *NSK II*.  The ITC rightly states that it "must examine factors other than subject imports to ensure that it is not attributing injury from other factors to the subject imports" in a way that inflates "an otherwise tangential cause of injury into one that satisfies the statutory material injury threshold."  *Remand Determination* at 7.  However, without a more faithful adherence to the court's remand instructions and thorough analysis of non-subject imports, the court is not convinced that the ITC conducted a meaningful inquiry on the issue of causation on remand.

    Equally troubling to the court is the cursory treatment of the evidence provided and the conclusions reached by the ITC on this issue in its *Remand Determination.*  The ITC incorrectly surmised that the court had asked it to conduct a rigid "market share replacement" analysis and consider "'whether non-subject imports have captured, or are likely to capture, market share previously held by the subject imports, and whether this level of displacement makes it unlikely that removal of the orders will lead to continuation or recurrence of material injury as a result of subject imports.'"[11]  *Id.* at 9, 37 (citing *NSK I*, 32 CIT at ___, 577 F. Supp. 2d at 1333).  Though

---

statutes at issue, and in a sunset review the ITC must determine whether the subject imports would likely continue to materially injure or cause material injury to the domestic industry in the absence of the antidumping duty order.  §§ 1675(c), 1675a(a).

    [11] In one of the few instances in which the ITC mentions *NSK II* in the *Remand Determination*, Defendant cites to this quoted passage as proof that the agency must determine whether non-subject imports captured the market share previously held by the subject imports.  *Id.* at 37 n. 260, 39 n.272 (citing *NSK II*, 32 CIT at ___, 593 F. Supp. 2d at 1372).  However, a

the court explained in *NSK II* that the ITC was not required to follow a particular methodology in

its causation inquiry, the agency nonetheless read the court's instructions to contain three

separate inquiries:

> First, the [c]ourt directed the [ITC] to assess whether "non-subject imports *have
> captured* . . . the market share previously held by the subject imports." [*NSK I*, 32
> CIT at ___, 577 F. Supp. 2d at 1333] (emphasis added).  Second, the [c]ourt
> instructed the [ITC] to assess whether the "non-subject imports . . . are *likely to
> capture* market share previously held by the subject imports" in its analysis.  *Id.*
> [(emphasis added)].  Third, to the extent the non-subject imports have or will
> capture the market share held by the subject imports, the [c]ourt has instructed the
> [ITC] to assess "whether this level of displacement makes it unlikely that removal
> of the orders will lead to continuation or recurrence of material injury as a result
> of subject imports."  *Id.*

*Id*. at 37 n.260.  The court will comment on this analysis to give further guidance to the ITC in

preparing its new remand results.

The ITC first determined that non-subject imports did not "fully, or even mostly,

capture[] the market share previously held by the subject imports before the orders were put in

place."  *Id*. at 37-38.  The agency noted that while the subject imports "lost approximately seven

percentage points of market share during the period from 1987 through 2005," the subject

merchandise remained a consistent and significant presence in the market after the orders were

imposed, maintaining a market share between 11.5% and 14% over that time.  *Id*. at 38.  The

agency noted that although the market share of non-subject imports grew from 5.2% in 1987 to

23.6% in 2005, "most of the market share increases obtained by the non-subject imports occurred

at the expense of the domestic industry . . . ."  *Id*. at 38-39.  The ITC then summarily concluded

---

closer reading of that passage demonstrates that the focus of the court's discussion was on the
factual conditions that triggered the non-subject import analysis in *Gerald Metals*, *Bratsk*, and
*Mittal*, just as they did in *NSK I*.  *NSK II*, 32 CIT at ___, 593 F. Supp. 2d at 1372.

that because the subject imports "actually gained a small amount of market share from the other participants in the market between 2000 and 2005," the agency had sufficiently established that "non-subject imports have captured no market share at all from subject imports . . . ." *Id*. at 39. Apart from this conclusory statement, the ITC does not justify its finding on the first prong with any additional evidence.

The court cannot reasonably discern how the ITC concluded that subject imports are more than a mere minimal or tangential cause of likely injury to the domestic industry, especially when most of the non-subject imports' market share increases occurred at the expense of the domestic industry. The ITC fails to explain why the period from 2000 to 2005 is most indicative of trends in the subject imports' market share, especially when a more broad analysis that covers market share fluctuations over the life of the antidumping duty order seems most logical. Moreover, the agency does not reveal the identity of the "other participants" in the market from which subject imports gained market share, an omission that is significant because domestic products, as well as subject and non-subject imports, are normally the only components that comprise the domestic market in this context. Even more troubling to the court is that the agency acknowledges, albeit in a footnote, that non-subject imports are certain to deleteriously affect the domestic market:

> [B]ecause the non-subject imports entered the market and took market share primarily from the domestic industry, we find that it was not the [antidumping duty] orders that drew most of the non-subject imports into the market, but the attractiveness of the U.S. market. In our view, this indicates that non-subject imports will not readily exit the market and will compete aggressively with the likely significant volumes of subject imports that enter the market after the revocation of the orders, in attempting to maintain their existing market share. This intense competition between the subject and non-subject imports will likely have a significant adverse impact on domestic market share, sales volumes and revenues, and pricing.

*Id.* at 39 n.271.  In spite of this evidence and the obvious gaps in logic, the ITC concluded that

subject imports are a more than minimal or tangential cause of the likely injury to the domestic

industry.

The ITC's lack of rigor is further demonstrated in its analysis of whether "non-subject

imports . . . are *likely to capture* market share previously held by the subject imports." *Id.* at 39

(citing *NSK I*, 32 CIT at ___, 577 F. Supp. 2d at 1333).  Again using historical market share

trends, the ITC determined that "while the non-subject imports did capture some market share

from the subject imports before [2000], they have not captured any meaningful level of market

share from the subject imports since [2000]." *Id.* at 39.  These historical trends, coupled with

evidence of the subject imports' steady market share, led the agency to therefore conclude that

"in the reasonably foreseeable future non-subject imports are [un]likely to capture the market

share previously held by the subject imports before the orders were imposed." *Id.* at 39.  The

ITC explained that "the presence of the non-subject imports in the market will not prevent the

subject imports from seeking to regain market share in a significant fashion from the domestic

industry[] once the disciplining effects of the orders are removed." *Id.* at 40.

The court is not persuaded and, more importantly, the ITC's analysis here misses the

point.  In its examination of the second prong, the agency merely asserts that the evidence it

deemed sufficient to satisfy the first prong of the "market share replacement" test is equally

compelling in its analysis of the second prong.  Crucially, however, the ITC does not set forth the

groundwork which explains why the historical data on market share trends rationally explains

that the subject imports play more than a minor role in causing the likely continuing or recurring

injury to the domestic industry.  The ITC also fails to explain and support its view that subject

producers would be able to drop prices to the levels required to recapture market share from the

non-subject imports.  Instead, the ITC's *Remand Determination* includes nothing more than

broad conclusory statements that leave the court in the dark and unable to discern how the agency

connected the dots between the facts on the record and the conclusions stated on remand.

Finally, and crucially, the ITC failed to adequately explain why subject imports would be

more than a minimal or tangential cause of likely injury given the significant price underselling

by non-subject imports.  The ITC conducted certain price comparisons, which showed non-

subject imports "undersold the domestic like products in approximately 66[%] of possible price

comparisons and undersold the subject imports in approximately 72[%] of the possible price

comparisons."  *Id.* at 41.  While the ITC attributes the non-subject imports' underselling activity

to the "volume- and price-disciplining effects" of the antidumping duty orders, the agency also

emphasizes that its earlier analysis demonstrates that "subject imports will, upon revocation of

the orders, begin aggressively underselling the domestic and non-subject merchandise in an

attempt to regain the market share that they have lost . . . ."  *Id.*  That data, the ITC claims,

sufficiently shows that the "levels of underselling by the subject imports are likely to have a

significant adverse effect on both domestic and non-subject prices, and on the overall condition

of the industry."  *Id.*  The agency's determination is problematic.  First, the ITC presumes,

without providing any evidence to support its claim, that the subject imports will be in a position

to compete successfully against non-subject imports once the antidumping duty order is removed.

This error echoes those found in other sections of the non-subject analysis: the justifications

provided for its conclusion lack reason and substance.  Moreover, the ITC cannot rely on its

earlier analysis of the likely underselling by subject imports to support its determination because

that examination was itself inadequate.  In other words, the ITC fails to directly address the

significant underselling by non-subject imports, and instead side-steps the issue using

unpersuasive and incomplete reasoning.

  In sum, the ITC failed to comply with the court's remand instructions on the issue of

causation, and the evidence on record and the conclusions reached in the *Remand Determination*

do not establish a causal link between the subject imports and likely future injury to the domestic

industry.  It may well be that the fact that the market share of the subject imports did not change

significantly from 2000 to 2005 shows that they remain more than a mere minimal or tangential

cause of injury to the domestic industry.  However, the court cannot determine that threshold

issue on the record before it, absent a more complete analysis of the role of non-subject imports

in the market.  In its second remand determination, the agency must perform a more focused

analysis on the causation issue to determine whether the subject imports are more than a mere

minimal or tangential cause of injury in light of the significant presence of non-subject imports in

the domestic market.  Without that analysis, the ITC cannot "give full consideration to the

causation issue and [ ] provide a meaningful explanation of its conclusions."  *Mittal*, 542 F.3d at

878.

## B.  The Cumulation of Ball Bearings from the United Kingdom with other Subject Imports

  The ITC "may cumulatively assess the volume and effect of imports of the subject

merchandise from all countries . . . if such imports would be likely to compete with each other

and with domestic like products in the United States market." § 1675a(a)(7). Notably, the

agency shall not cumulate imports of the subject merchandise in cases where it determines that

such imports are not likely to have a discernible adverse impact on the domestic industry. *Id.*

Thus, the cumulation question involves a two-step process, whereby the agency must first ask

whether the subject imports will have any discernible impact. *See Neenah Foundry Co.*, 25 CIT

at 712, 155 F. Supp. 2d at 775. If the ITC answers that question affirmatively, then the

remaining question is whether that impact is adverse. *See id.* Only where the impact is both

discernible and adverse may the ITC cumulate the subject imports. *See id.* In *NSK I*, the court

asked the agency to reexamine its decision to cumulate ball bearings from the United Kingdom

with imports from other subject countries. 32 CIT at ___, 577 F. Supp. 2d at 1338. More

specifically, the court found that "the ITC failed to address the significant rise in non-subject

imports and large scale restructuring within the ball bearing industry . . . ." *NSK I*, 32 CIT at ___,

577 F. Supp. 2d at 1338. The court therefore remanded the ITC's decision to cumulate, and in

particular its analysis of the discernible adverse impact of the U.K. ball bearings, (1) "for

additional explanation as to whether the potential volumes of U.K. exports . . . are likely to have

an adverse impact on the domestic industry if the order is removed," as well as (2) for a more

thorough analysis of non-subject imports. *Id.*, 32 CIT at ___, 577 F. Supp. 2d at 1338.

On remand the ITC reaffirmed its earlier decision, finding that the subject imports from

the United Kingdom "are likely to have a discernible adverse impact on the domestic industry if

the order is revoked." *Remand Determination* at 21. NSK argues that the ITC does not support

its redetermination of this issue with substantial evidence, and that the court should remand anew

the issue of cumulation.[12]  NSK Comments at 2-17.  JTEKT similarly claims that the *Remand*

*Determination* does not adequately confront the concern surrounding the significant presence of

non-subject imports in the domestic market.  JTEKT Comments at 2-27.

### 1.  Restructuring within the Ball Bearing Industry

After the agency recycled much of the analysis it originally provided in the second sunset

review, *Remand Determination* at 21-24, the ITC first addressed the issue of restructuring within

the ball bearing industry and found that "the domestic industry suffered serious declines in its

production levels, sales volumes, sales revenues, income, profit margins, market share and

employment, and that these declines cannot be attributed solely, or even primarily, to the

---

[12] NSK lobbies a host of criticisms against the ITC's *Remand Determination*, none of which the court explores in detail here for reasons explained below.  More specifically, NSK contends that substantial evidence does not support the ITC's claim that the size alone of the ball bearing industry in the United Kingdom will likely have a discernible and adverse affect on the domestic industry, especially when compared to the ITC's decision in a related investigation which found that the subject imports from Singapore, a country whose ball bearing industry is much larger in size than that in the United Kingdom, would not be likely have a discernible adverse impact.  NSK Comments at 2-4.  NSK goes on to criticize the agency's analysis of other elements of the U.K industry, specifically noting that the industry is similar in character to the industry in Singapore; that the production priorities of the U.K. producers do not focus on the U.S. market; and that the remaining U.K. production capacity cannot be geared toward the United States because restructuring within one of the largest U.K. producers with excess capacity restricts that company's ability to ship ball bearings to the United States.  NSK Comments at 3-6.  NSK also rejects the ITC's finding that the export focus of the U.K. industry makes it likely that subject U.K. imports will have a discernible adverse impact because the statistics for the U.K. and Singapore industries are nearly identical, and the agency found the latter to have no likely discernible adverse impact.  NSK Comments at 7-10.  NSK also discounts the ITC's finding that the volume (in terms of value) of the U.K. industry's shipments makes it likely that subject imports from the United Kingdom will have a discernible adverse impact, alleging that the agency failed to consider that British ball bearings generally involve higher-value, unique products that cannot be utilized in the United States.  NSK Comments at 10-14.  Finally, NSK avers that the limited U.K. price data prevents the ITC from drawing any conclusions about the price effects of ball bearings from the United Kingdom.  NSK Comments at 14-15.

industry's 'restructuring' efforts." *Id.* at 25.  Here, the agency incorporated by reference its

discussion of restructuring in the ball bearing industry that appears later in the report in its

reassessment of the likely impact of the subject imports on the domestic market.  *Id.* at 24-25.  In

that analysis, the ITC provides three principal justifications for its determination that the

domestic market is vulnerable and that subject imports will likely have a negative impact on the

domestic industry.  First, the agency found that the domestic industry's capacity and production

reductions are a result of competition from subject imports, and not from restructuring within the

ball bearing industry.  *Id.* at 31-32.  The bases for the ITC's conclusion were that (1) only two

domestic producers stated that the drop in production capacity was intended to retool their

capacity to produce high-valued, customized bearings; (2) the majority of producers who reduced

production capacity did so because of their inability to meet "aggressive import competition" in

the U.S. market; and (3) the three domestic producers that reported the largest capacity declines

during the period "all stated that they closed production facilities in the United States due, in

significant part, to price competition from subject and/or non-subject imports." *Id.* at 31.  The

evidence that the ITC cites to support its conclusion is tenuous.  Importantly, only one of the

twenty companies that reported U.S. production capacity figures for the 2000 to 2005 period

actually stated that the *subject imports* were responsible for the changes in production capacity.

*See Certain Bearings from China, France, Germany, Italy, Japan, Singapore, and the United*

*Kingdom: Investigation Nos. 731-TA-344, 391-A, 392-A and C, 393-A, 394-A, 396, and 399-A*

*(Second Review)*, USITC Pub. 3876 (Aug. 2006) ("*Staff Report*") at BB-I-48 to I-55, Table BB-I-

13.  Moreover, a closer look at the top three companies who accounted for more than three-

quarters of the reduction in U.S. production capacity during the period of review confirms that

the overall decrease in production capacity took place as part of those companies' efforts to

restructure their U.S. business platform for reasons totally unrelated to the subject imports. *See*

*id*. at BB-I-48 to I-55, Table BB-I-13; *id.*, BB-III-1 to III-5, Table BB-III-1.  The ITC failed to

account for this conflicting evidence on the record when it stated its conclusions, and it must

explain rationally why such evidence is insignificant to its finding on the next remand. *See*

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994)

(explaining that the ITC must address contradictory evidence or evidence from which conflicting

inferences may be drawn in its analysis).

Second, the ITC determined that "even if the reductions in the industry's capacity could

be attributed to a strategic decision on the industry's part . . . , the declines in the industry's

capacity levels do not fully account for the corresponding declines in the industry's production

levels and sales volumes during the period of review." *Remand Determination* at 32.  The

agency found that while capacity fell by 110.4 million ball bearings from 2000 to 2005,

production and shipment levels fell by 125 million ball bearings over the same period, which

represented a drop that was "approximately 15 million bearings larger than the decline in the

industry's capacity during the period." *Id*.  Without any additional analysis or explanation, the

ITC hastily concluded in the next sentence that because the "15 million bearing decline

represents approximately 12[%] of the declines in the industry's total production and shipment

quantities between 2000 and 2005," the decline in the industry's production, shipment and sales

levels "cannot be attributed to the reductions in the industry's capacity during the period, whether

or not that reduction was designed to rationalize its bearing production in the U.S. and other

markets." *Id*. However, the ITC does not explain, for example, how this data answers the courts

concern regarding the effect of restructuring within the ball bearing industry, or why the period

from 2000 to 2005 is the best time frame in which the agency must look to alleviate the court's

concerns. That there were declines in the domestic industry's production, shipment and sales

levels does not necessarily mean that the domestic industry was vulnerable to likely material

injury from the subject imports, and the ITC's failure to offer some meaningful explanation is yet

another example of the absence of a rational connection between the facts and conclusions in the

*Remand Determination.*

          Finally, the ITC examines certain economic indicia to discredit the claim made by NSK

that the domestic industry is stronger, more robust, and healthier as a result of restructuring in the

ball bearing industry. In particular, the ITC analyzed (1) gross profits and operating income

levels, (2) gross profit and operating income margins, (3) cost structures, (4) capacity utilization

rates, (5) net sales revenues, and (6) market share levels. *See id.* at 32-34. In assessing each of

these six components, the ITC concluded that restructuring within the ball bearing industry did

little to improve the health of the domestic industry. *See id*. Notwithstanding the ITC's thorough

analysis of these factors, the court is still left with the question of "whether the potential volumes

of U.K. exports . . . are likely to have an adverse impact on the domestic industry if the order is

removed." *NSK I*, 32 CIT at ___, 577 F. Supp. 2d at 1338. Here, the ITC did little to expand on

its earlier analysis of the potential volumes of U.K. exports in the *Remand Determination*. That

restructuring of the ball bearing industry did not improve the health of the domestic market does

not necessarily mean that the potential volumes of U.K. exports will have a likely discernible

impact if the antidumping order is removed.  Without more, the court cannot sustain the ITC's

analysis on remand.

### 2.  The Presence of Non-Subject Imports in the Domestic Market

On the effect of non-subject imports and the ITC's decision to cumulate the subject

imports, the agency determined that "the increase in non-subject imports has not resulted in a

significant displacement of the subject U.K. ball bearings during the period of review."[13]

*Remand Determination* at 25.  The ITC reiterated that the non-subject imports did not

"significantly replace[] the subject imports from the United Kingdom" or "capture significant

market share from the U.K. imports . . . ."  *Id.*  The ITC also noted that, upon revocation of the

order, "the subject U.K. imports are likely to begin pricing their products more aggressively in

the market in order to recover any market share that may have been lost immediately after

imposition of the U.K. order."  *Id.*  The agency closes its analysis explaining that its conclusions

are "not affected by the fact that non-subject imports occupy a considerably larger share of the

market than the subject imports from the United Kingdom."  *Id.*  Curiously, the agency does not

provide an explanation as to why that fact is inconsequential to its analysis, but instead reminds

the court that the discernible adverse impact standard presents a "relatively low threshold" and is

"relatively easy" for the ITC to satisfy.  *Id.*

---

[13] In considering this issue on remand, the ITC expressly incorporated its analysis of the
non-subject imports that is discussed and reviewed by the court in Section III.A of this opinion.
*Remand Determination* at 25.

For the reasons explained above in Section III.A, the ITC's analysis of non-subject imports is contrary to law and, therefore, the agency's reliance on its conclusions from that portion of the *Remand Determination* is unhelpful.  Furthermore, the ITC's analysis here does nothing more than assert broad conclusions, with each statement lacking concrete and rational grounds for the agency's ultimate determination.  The ITC also does not explain how the subject imports from the United Kingdom are well suited to begin pricing their products more aggressively in the market to recover market share once the order is revoked.  Finally, that the discernible adverse impact standard presents a "relatively low threshold" does not license the ITC to act arbitrarily, nor does it absolve the agency from its duty to address an import aspect of the problem.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc.*, 463 U.S. at 43.

Thus, the court asks the ITC to revisit this issue for a third time to provide a more careful and reasoned examination of (1) the large scale restructuring within the ball bearing industry and (2) the significant rise in non-subject imports in the domestic market.

**C.  The Vulnerability of the Domestic Market and the Likely Impact of Subject Imports on the Domestic Industry**

To make a proper injury determination, the ITC must consider the likely impact of imports of the subject merchandise on the industry if the order is revoked.  § 1675a(a)(1).  As part of that inquiry, the agency evaluates "all relevant economic factors described in [§ 1675a(a)(4)] within the context of the business cycle and the conditions of competition that are distinctive to the affected industry."  § 1675a(a)(4).  In the second sunset review, the ITC divided the conditions of competition into three categories: supply, demand, and substitutability.

*NSK I*, 32 CIT at ___, 577 F. Supp. 2d at 1338.  In the second sunset review, the ITC did not

account for the significant restructuring within the industry when it made its determination on

this issue.  *Id.*, 32 CIT at ___, 577 F. Supp. 2d at 1339.  The court therefore instructed the ITC to

reconsider the supply conditions within the domestic market, and to specifically reassess the

agency's vulnerability and likely impact findings in light of the significant restructuring within

the global ball bearing industry.  *Id.*  The court explained that the record suggests "global

restructuring had the effect of depressing certain economic measures of industry performance

relied upon [by the ITC] to cast the U.S. market as vulnerable," and "[w]hether the domestic

industry is vulnerable to increased volumes of subject imports or simply responding to other

market forces is an appropriate inquiry" for the ITC to perform on remand.  *Id.*

        On remand, the ITC found that "serious declines in almost all significant indicia of the

industry's condition establish that the industry was in a weakened condition at the end of the

period and was therefore vulnerable to likely material injury from the subject imports."  *Remand*

*Determination* at 31.  NSK argues that the ITC does not support its reassessment of the likely

impact of the subject imports with substantial evidence.  First, NSK disagrees with the ITC's

finding that the subject imports, rather than global restructuring within the ball bearing industry,

are the source of the decline in U.S. production capacity.  NSK Comments at 18-21.  Second,

NSK charges that changes in U.S. production volume are not by reason of the subject imports

and therefore it is unlikely that the subject ball bearings will have a negative impact on the

domestic industry.  NSK Comments at 21-24.  Finally, NSK contends that certain financial

indicators do not support the ITC's determination that subject imports will likely have a negative

impact on the domestic industry. NSK Comments at 24-30.

For the reasons explained above in Section III.B.1 of this opinion, the ITC failed to

sufficiently address the effect of restructuring within the ball bearing industry in its analysis on

remand. The agency did not genuinely respond to the court's inquiry of whether the domestic

industry is vulnerable to increased volumes of subject imports or is simply responding to other

market forces. On this issue, the ITC does not connect the evidence on the record with its

conclusions in a rational fashion, and it fails to meaningfully address conflicting evidence on the

record when it stated its conclusions. Moreover, the agency merely recites positions that the

court found unpersuasive in *NSK I*. Therefore, the court remands this issue to the ITC for a

second time so that it may more thoroughly analyze the significant restructuring in the ball

bearing industry and its effect on (1) the vulnerability of the domestic market and (2) the likely

impact of the subject imports on the domestic market. The ITC must also address conflicting

evidence on the record in reaching its conclusions on this issue. *See Suramerica de Aleaciones

Laminadas, C.A.*, 44 F.3d at 985.

### IV. Conclusion

For the foregoing reasons, the court holds that the *Remand Determination* is not

supported by substantial evidence or in accordance with law. The ITC acted contrary to law

when it failed to determine whether the subject imports are more than a minimal or tangential

cause of likely injury to the domestic industry given the significant presence of non-subject

imports in the domestic market. The ITC also failed to support its (1) decision to cumulate ball

bearings from the United Kingdom with other subject imports and (2) analysis of the likely

impact of subject imports on the domestic industry with substantial evidence.  Accordingly, it is

hereby

   **ORDERED** that the ITC's *Remand Determination* is not supported by substantial

evidence or in accordance with law, and that the case is therefore **REMANDED** to the ITC for

further proceedings not inconsistent with this opinion.  Specifically, it is

   **ORDERED** that the ITC must comply with the court's instructions on the issue of

causation in *NSK I* and *NSK II* and discern whether the subject merchandise would likely

continue to materially injure or cause material injury to the domestic industry if Commerce

revoked the antidumping duty order.  That inquiry necessarily requires the ITC to determine

whether, in light of the significant presence of non-subject imports, the subject imports are more

than a mere minimal or tangential factor in the material injury to the domestic industry that is

likely to continue or recur in the absence of the antidumping duty order; it is further

   **ORDERED** that the ITC must reexamine its decision to cumulate ball bearings from the

United Kingdom with other subject imports.  In so doing, the ITC must provide a more careful

and reasoned examination of (1) the large scale restructuring within the ball bearing industry and

(2) the significant rise in non-subject imports in the U.S. market.  In the second remand

proceeding, the agency must demonstrate a rational connection between the evidence on the

record and the conclusions it reaches, as well as provide a more through account of the

conflicting evidence on the record and an explanation as to why that evidence is not relevant or is

unpersuasive; it is further

**ORDERED** that the ITC must revisit its determination on the vulnerability of the domestic market and the likely impact of subject imports on the domestic market.  In providing a more rigorous and reasoned examination of the likely impact of the subject imports on the domestic industry, the ITC must meaningfully (1) analyze the significant restructuring in the ball bearing industry and its effect on the vulnerability of the domestic market and the likely impact of subject imports on said market, as well as (2) address conflicting evidence on the record in reaching its conclusions and explain why that evidence is irrelevant or is unpersuasive; and it is further

**ORDERED** that the ITC shall have until January 5, 2010, to file its remand results with the Court.  All other parties shall file their comments on the ITC's second remand determination with the Court no later than February 4, 2010.

Dated:  August 31, 2009                                    /s/ Judith M. Barzilay
        New York, New York                              Judith M. Barzilay, Judge

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                          Deputy Clerk