Slip Op. 10-38

# UNITED STATES COURT OF INTERNATIONAL TRADE

```
------------------------------------------------------x
                                                      :
NSK CORPORATION, et al.,                              :
                                                      :
            Plaintiffs,                               :
                                                      :
            and                                       :
                                                      :
FAG ITALIA S.p.A., et al.,                            :
                                                      :
            Plaintiff-Intervenors,                    :
                                                      :   Before: Judith M. Barzilay, Judge
            v.                                        :   Consol. Court No. 06-00334
                                                      :
UNITED STATES,                                        :
                                                      :
            Defendant,                                :
                                                      :
            and                                       :
                                                      :
THE TIMKEN COMPANY,                                   :
                                                      :
            Defendant-Intervenor.                     :
                                                      :
------------------------------------------------------x
```

## OPINION & ORDER

[The court sustains in part and remands in part the second remand determination of the U.S. International Trade Commission, the agency acting on behalf of Defendant.]

Dated: April 12, 2010

*Crowell & Moring LLP* (*Matthew P. Jaffe*, *Robert A. Lipstein*, and *Carrie F. Fletcher*), for Plaintiffs NSK Corporation, NSK Ltd., and NSK Europe Ltd.

Consol. Court No. 06-00334 Page 2

*Sidley Austin LLP* (*Neil R. Ellis* and *Jill Caiazzo*), for Plaintiffs JTEKT Corporation and Koyo Corporation of U.S.A.

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP* (*Max F. Schutzman* and *Andrew T. Schutz*), for Plaintiff-Intervenors FAG Italia S.p.A., Schaeffler Group USA, Inc., Schaeffler KG, The Barden Corporation (U.K.) Ltd., and The Barden Corporation.

*Steptoe & Johnson* (*Herbert C. Shelley* and *Alice A. Kipel*), for Plaintiff-Intervenors SKF Aeroengine Bearings UK and SKF USA, Inc.

*United States International Trade Commission*, *James M. Lyons* (General Counsel), *Neal J. Reynolds* (Assistant General Counsel for Litigation), and *David A.J. Goldfine*, Office of the General Counsel, for Defendant United States.

*Stewart and Stewart* (*Terence P. Stewart*, *Eric P. Salonen*, *Elizabeth A. Argenti*, and *Philip A. Butler*), for Defendant-Intervenor The Timken Company.

    Barzilay, Judge: This case returns to the court following the U.S. International Trade Commission's (the "Commission") second remand determination on the sunset review from 2000 to 2005 of certain antidumping duty orders covering ball bearings from Japan and the United Kingdom.[1] *Views of the Commission on Remand*, Inv. Nos. 731-TA-394-A, 731-TA-399-A (Jan. 5, 2010) ("*Second Remand Determination*"). In *NSK Corp. v. United States*, 32 CIT ___, 577 F. Supp. 2d 1322 (2008) ("*NSK I*"), as further directed by *NSK Corp. v. United States*, 32 CIT ___, 593 F. Supp. 2d 1355 (2008) ("*NSK II*"), and *NSK Corp. v. United States*, 33 CIT ___, 637 F. Supp. 2d 1311 (2009) ("*NSK III*"), the court affirmed in part and remanded in part the Commission's sunset review of the subject antidumping duty orders. While the lack of substantial evidence undercut some of the agency's findings, the bulk of the court's concerns centered on the Commission's failure to sufficiently address certain evidence on global

---

[1] The court presumes familiarity with the procedural history of the case.

Consol. Court No. 06-00334                                                                                              Page 3

restructuring within the ball bearings industry and the significant presence of non-subject imports in the United States market. *See generally NSK III*, 33 CIT \_\_\_, 637 F. Supp. 2d 1311; *NSK II*, 32 CIT \_\_\_, 593 F. Supp. 2d 1355; *NSK I*, 32 CIT \_\_\_, 577 F. Supp. 2d 1322. In August 2009, the court remanded the Commission's affirmative injury determination for a second time, and asked the agency to reconsider (1) whether the Commission may cumulate ball bearings from the United Kingdom with other subject imports, (2) the likely impact of subject imports on the domestic industry upon revocation of the antidumping duty orders, and (3) whether the subject imports likely would constitute more than a minimal or tangential cause of material injury to the domestic industry in the absence of the subject orders. *NSK III*, 33 CIT at \_\_\_, 637 F. Supp. 2d at 1328-29. In the *Second Remand Determination*, currently at issue, the Commission does not support part of its cumulation analysis with substantial evidence, and the court therefore cannot address the merits of the remaining two issues and, consequently, remands the case to the agency.

## I. Standard of Review

The Court cannot sustain an agency determination "unsupported by substantial evidence on the record." 19 U.S.C. § 1516a(b)(1)(B)(i). An agency supports its findings with substantial evidence when it offers "more than a mere scintilla" of relevant and reasonable evidence to buttress the conclusion. *See Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). To provide the requisite support, the agency must offer more than conjecture. *See NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319-20 (Fed. Cir. 2009) (citation omitted). Although the court does not require perfection from the agency in its explanations, the path taken by the administrative body "must be reasonably discernible." *Id.* at 1319 (citation omitted). At a minimum, the agency must

Consol. Court No. 06-00334                                                                             Page 4

explain the standards applied and rationally connect them to the conclusions drawn from the record. *See Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). That evidence drawn from the record could support two opposing conclusions "does not prevent an administrative agency's finding from being supported by substantial evidence," *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted), and the court may not displace the agency's choice for its own. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). However, an administrative law touchstone requires the agency to address the evidence from which conflicting inferences may be drawn in its analysis. *See Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994).

## II. Discussion

### A. The Cumulation of Ball Bearings from the United Kingdom with Other Subject Imports

In a sunset review, the Commission may cumulate unfairly traded imports from multiple countries to adequately capture the goods' simultaneous injurious effects on the domestic industry that might otherwise be obscured in the agency's country-by-country review of the subject imports. *See* 19 U.S.C. § 1675a(a)(7); *Neenah Foundry Co. v. United States*, 25 CIT 702, 708-09, 155 F. Supp. 2d 766, 772 (2001) (quoting H.R. Rep. No. 100-40, pt. 1, at 130 (1987)).[2] The statute qualifies the agency's discretion and sets forth the following conditions precedent to

---

[2] The Federal Circuit recently reasserted the Commission's discretion whether to cumulate subject imports in a sunset review and the rationale supporting such a measure. *Nucor Corp. v. United States*, Appeal No. 09-1234, slip op. at 3, 9 (Fed. Cir. Apr. 7, 2010). Notably, the agency declined to cumulate certain subject imports under conditions of competition and other facts similar to this case. *See id.* at 4-6.

Consol. Court No. 06-00334												Page 5

cumulation: (1) all subject reviews must have been initiated on the same day; (2) the subject imports must likely compete with each other and with domestic like products in the United States market; and (3) and the Commission must determine that the subject imports likely will have a discernible adverse impact on the domestic industry. § 1675a(a)(7). With respect to the final prong, the Commission must conclude that the likely impact will be both discernible and adverse, though no statutory provision enumerates the factors that the Commission must consider in its analysis. *See Neenah Foundry Co.*, 25 CIT at 712-13, 155 F. Supp. 2d at 775. In its analysis, "the Commission generally considers the likely volume of subject imports and the likely impact of such imports on the domestic industry within a reasonably foreseeable time" in the absence of the orders.[3] *Allegheny Ludlum Corp. v. United States*, 30 CIT 1995, 2000, 475 F. Supp. 2d 1370, 1376 (2006) (citation omitted). While the impact standard may be met "easily," the Court has found that

> a reasonable finding of likely discernible adverse impact requires that the [Commission] establish that it is likely that [the producer] could obtain a discernible amount of [the subject product] from somewhere – such as by exploiting excess capacity, by shifting from domestic and internal production, or by shifting from other export markets – and would have some incentive to sell a discernible amount into the U.S. market.

*Cogne Acciai Speciali S.p.A. v. United States*, 29 CIT 1168, 1173 (2005) (not reported in F. Supp.) ("*Cogne*"); *accord Nippon Steel Corp. v. U.S. Int'l Trade Comm'n*, 494 F.3d 1371, 1379 (Fed. Cir. 2007) ("*Nippon Steel*"); *see also Usinor Industeel, S.A. v. United States*, 27 CIT 1395, 1403 (2003) ("*Usinor*") (not reported in F. Supp.), *aff'd*, 112 F. App'x 59 (Fed. Cir. 2004).

---

[3] The term "likely" means "probable" or "more likely than not," and requires more than mere possibility. *Weiland-Werke AG v. United States*, 31 CIT 1884, 1890, 525 F. Supp. 2d 1353, 1361-62 (2007) (quotation marks & citations omitted), *aff'd*, 290 F. App'x 348 (Fed. Cir. 2008).

Inherent in the language of these cases lies the requirement that the incentive likely would lure those additional exports specifically toward the United States in the absence of the order.[4] *Nippon Steel*, 494 F.3d at 1379 (finding that higher prices in domestic market attracted "any" excess production of subject goods and caused "potential redirection" from other countries specifically to United States); *Cogne*, 29 CIT at 1173 (noting Commission must establish that some incentive likely would drive subject producer to direct discernible amount of subject goods particularly to United States); *Usinor*, 27 CIT at 1403 (upholding affirmative cumulation determination where Commission presented evidence that subject producers were export oriented and had demonstrated interest in exporting their products specifically to United States).

      In *NSK III*, the court found that the Commission failed to complete its cumulation analysis in the first remand determination in accordance with law and to support its determination with substantial evidence. 33 CIT at ___, 637 F. Supp. 2d at 1325-27. First, the court asked the Commission to revisit its analysis on the large-scale restructuring within the ball bearing market and the significant rise in non-subject imports in the United States market, *id.* at ___, 637 F. Supp. 2d at 1327, since the effect from those two elements "might have skewed its analysis of the domestic industry's level of vulnerability" and the agency's discernible adverse impact analysis. *NSK I*, 32 CIT at ___, 577 F. Supp. 2d at 1338. Next, on the question of restructuring, the court asked the Commission (1) to reevaluate the vulnerability of the domestic

---

[4] The standard does not require the Commission to determine that the incentive likely would cause subject producers to export the discernible amount of the subject merchandise *only* to the United States and, thus, does not foreclose the possibility that the subject producers may divert some of the additional exports to other markets. *See Nippon Steel*, 494 F.3d at 1379; *Cogne*, 29 CIT at 1173; *Usinor*, 27 CIT at 1403.

industry and to consider the conflicting evidence on the record showing that companies within the domestic industry "restructure[d] their U.S. business platform for reasons totally unrelated to the subject imports";[5] (2) to rationally explain how declines in the domestic industry's production and shipment levels demonstrate vulnerability, as opposed to highlighting the natural consequences flowing from significant restructuring within the United States ball bearing market;[6] and (3) to link certain economic indicia to the agency's discernible adverse impact conclusion in a rational fashion. *NSK III*, 33 CIT at ___, 637 F. Supp. 2d at 1325-27. With respect to non-subject imports, the court found that the agency failed to address conflicting record evidence that suggested large volumes of non-subject imports minimized the discernible

---

[5] In its characterization of the court's analysis of this issue, the Commission implies that the court displaced the agency's reading of the record with its own. *Second Remand Determination* at 15 ("According to the Court, the record *could be read* to show that the reported capacity and production declines were generally due to factors other than the subject imports.") (emphasis added) (citing *NSK III*, 33 CIT at ___, 637 F. Supp. 2d at 1325-26). To the contrary, a full reading of the subject passage reveals that the court required the Commission to "explain rationally why [the conflicting] evidence is insignificant to its [vulnerability] finding on the next remand," *NSK III*, 33 CIT at ___, 637 F. Supp. 2d at 1326, a charge consistent with an agency's duty to address conflicting evidence on the record and support its conclusions with substantial evidence. *See Suramerica de Aleaciones Laminadas, C.A.*, 44 F.3d at 985. In any event, the Commission abandons its position and now concedes that "the industry was engaged in significant restructuring during the period of review, that the resulting changes in the industry's capacity levels had a depressing effect on the industry's production, shipment and sales levels, and that these reductions were not due solely or primarily to the effects of the subject import competition." *Second Remand Determination* at 21.

[6] The court also asked the Commission to explain why it focused solely on the years falling under the most recent sunset review, given that the antidumping order has covered the subject merchandise since 1989. *NSK III*, 33 CIT at ___, 637 F. Supp. 2d at 1326. On remand, the agency reasonably explained that the period from 2000 to 2005 contained "the most probative data on the current state of the industry" and that "the industry's restructuring efforts had been primarily effectuated during the second period of review." *Second Remand Determination* at 25 & n.92 (citations omitted).

adverse impact of the subject United Kingdom imports.[7] *Id.* at \_\_\_, 637 F. Supp. 2d at 1327. The agency had provided only conclusory statements that such evidence did not affect its determination.[8] *Id.* (citing *Certain Ball Bearings and Parts Ther[e]of from Japan and the United Kingdom*, USITC Pub. 4082, Inv. Nos. 731-TA-394-A, 731-TA-399-A, at 25 (May 2009)).

On remand, the Commission confirmed the vulnerability of the domestic ball bearing industry and concluded that the subject ball bearings from the United Kingdom likely will have a discernible adverse impact in the absence of the order. *Second Remand Determination* at 21-54. Plaintiffs NSK Corporation, NSK Ltd., and NSK Europe Ltd. (together, "NSK") attack several components of the Commission's determination.[9] NSK avers that the subject United Kingdom producers have no incentive to ship additional amounts of the subject merchandise to the United States in the absence of the order. NSK Comments 4-14. NSK bases its assertion on the United Kingdom industry's capacity and production capabilities and focus on markets other than the

---

[7] The court also found that the Commission detrimentally relied on deficient conclusions from other portions of the first remand determination in its non-subject imports analysis for purposes of the cumulation inquiry. *NSK III*, 33 CIT at \_\_\_, 637 F. Supp. 2d at 1319-24, 1327 (citing *Certain Ball Bearings and Parts Ther[e]of from Japan and the United Kingdom*, USITC Pub. 4082, Inv. Nos. 731-TA-394-A, 731-TA-399-A, at 25, 37-41 (May 2009)).

[8] The court suggested that, as part of its analysis, the Commission might choose to explain "how the subject imports from the United Kingdom are well suited to begin pricing their products more aggressively in the market to recover market share once the order is revoked." *NSK III*, 33 CIT at \_\_\_, 637 F. Supp. 2d at 1327. The agency has taken this statement to embody the court's principal remand instruction from *NSK III*.

[9] While Plaintiffs JTEKT Corporation and Koyo Corporation of U.S.A. (collectively, "JTEKT") focus their comments exclusively on the separate issue of causation and the role of non-subject imports in that inquiry, JTEKT Comments 5-28, the companies take no position on the Commission's reassessment of the vulnerability and discernible adverse impact findings. JTEKT Comments 5 n.2.

Consol. Court No. 06-00334                                                                 Page 9

United States, as well as the lack of a meaningful trend in certain price comparison data. NSK Comments 4-14. Finally, NSK discounts the Commission's vulnerability finding and asserts the record shows that (1) the three largest United States producers and (2) the remaining members of the domestic industry likely will not suffer an adverse impact by unrestrained subject imports.[10] NSK Comments 14-25. Defendant-Intervenor The Timken Company ("Timken") agrees with the Commission's cumulation analysis, reasoning that the agency supported its vulnerability and discernible adverse impact analyses with substantial evidence. Timken Comments 8-19, 34-42. On vulnerability, Timken shadows the agency's analysis and offers additional evidence on reductions in the industry's production capacity to purportedly prove the weakened condition of the United States ball bearing industry.[11] Timken Comments 8-19. Timken similarly echoes the Commission's analysis on discernible adverse impact. Timken Comments 34-42.

**1. The Vulnerability of the Domestic Ball Bearing Industry**

On remand, the Commission determined that, although the domestic industry significantly reduced its capacity levels during the period of review for reasons not primarily related to the subject United Kingdom imports, *Second Remand Determination* at 26-28, the

---

[10] Defendant-Intervenor The Timken Company ("Timken") objects to NSK's assertion that "evidence of the motives and intentions of individual producers" can negate an affirmative vulnerability finding. Timken Comments 9 n.11. The court agrees for reasons explained in this opinion.

[11] Curiously, Timken reaches for other record evidence to support the Commission's vulnerability finding after reminding the court in the preceding pages that "[s]o long as there is [an] adequate basis in support of the Commission's choice of evidentiary weight, the Court of International Trade . . . must defer to the Commission." Timken Comments 13 (citing *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1359 (Fed. Cir. 2006)). The Commission presumably accounted for this data in its analysis.

Consol. Court No. 06-00334	Page 10

United States ball bearings industry currently remains in a "weakened state" and, therefore, in a vulnerable condition at the end of the period of review. *Id.* at 29. As a result, the agency found the United States industry susceptible "both to the likely discernible adverse impact of the subject U.K. imports upon revocation of the U.K. order and to the likely material impact of the cumulated subject imports." *Id*. at 26. The Commission correctly notes that it need not determine that the subject imports caused the vulnerability of the domestic industry. *Id.* at 22-25 (citations omitted). The agency reasonably cites to the following economic indicia to stress that, contrary to NSK's claims that restructuring led to a more productive or efficient domestic industry, the United States industry remained in a weakened state during the period of review: (1) a 12.9% drop from 2000 to 2005 in the industry's capacity utilization rate; (2) a 22% decline in the industry's productivity, measured in terms of bearings produced per hour; (3) a deteriorated cost structure, including an increase in the ratio of the cost of goods sold relative to net sales revenues; and (4) dwindling profit levels, which consisted of across-the-board decreases in operating income levels and income margins, gross profits, and gross profit margins. *Id.* at 30-33. The Commission also points to declines in net sales revenue and market share during the period of review as substantial evidence of a vulnerable domestic industry.[12] *Id*. at 35-36. In view of this evidence and the agency's conclusion on this issue, the Commission has provided

---

[12] Importantly, the Commission rationally explains that, while the overall sales revenues increased from 1985 to 2005, "the growth in the industry's sales revenues since the original period of investigation failed to keep up with the growth in apparent U.S. consumption in the market between 1985 and 2005, indicating that the industry has been unable to improve its sales revenues to track the growth in demand." *Second Remand Determination* at 35-36 (footnotes omitted).

the rational connection missing from its previous determinations, and the court sustains the

agency's vulnerability finding.[13]

### 2. The Likely Discernible Adverse Impact of United Kingdom Ball Bearings

The Commission concluded that the subject United Kingdom imports likely would

increase "to a level that would have a discernibly adverse impact" based on the subject

producers' level of available capacity, high degree of export orientation, and continued presence

in and the price attractiveness of the United States market. *Second Remand Determination* at 47.

While the court appreciates the "relatively low threshold" the imports must cross to create a

discernible adverse impact, *Nippon Steel*, 494 F.3d at 1379 n.6 (citation omitted), the court still

must ensure that the agency supports its determination with substantial evidence, which includes

the requisite rational connection between the facts on the record and the conclusions drawn.[14]

*Matsushita Elec. Indus. Co.*, 750 F.2d at 933.  The agency fails to do so in the *Second Remand*

*Determination*.

---

[13] The Commission also addresses two other relevant arguments from NSK on this issue. First, despite NSK's request, the agency reasonably explains that it will not consider fluctuations in certain economic indicators at the end of the period of review as proof of a robust domestic industry, since "the small increases in these indicia simply did not come close to offsetting the double-digit declines in these indicia for the entire [period of review]." *Second Remand Determination* at 37.  Second, the Commission correctly declined NSK's request to exclude the financial results of three domestic producers from its vulnerability analysis, *id.* at 37-38, for the agency must evaluate the entire industry, which includes "producers as a whole of a domestic like product." 19 U.S.C. § 1677(4)(A); *see also Nevinnomysskiy Azot v. United States*, 32 CIT ___, ___, 565 F. Supp. 2d 1357, 1373 (2008) ("[T]he Commission must evaluate the entire industry and include all of the participating producers.") (citation omitted).

[14] This rational connection is especially important considering the facts of this case and the minuscule amount of subject United Kingdom imports present in the United States market, both in terms of market share measured by value and the quantity sold relative to the domestic market supply.

The agency's first problem stems from its reliance on the court's review of the Commission's assessment of certain price data under the "likely volume" and "likely price effects" components of the material injury analysis to support its affirmative discernible adverse impact conclusion. *Second Remand Determination* at 47 nn.177-78, 48 n.180, 49 nn.181 & 183, 53 n.201 (citing *NSK I*, 32 CIT at ___, 577 F. Supp. 2d at 1342-47). However, this Court has found that the discernible adverse impact and material injury analyses "are discrete inquiries" and that the agency may not rely on conclusions from one analysis to prove another. *Weiland-Werke AG*, 31 CIT at 1895, 525 F. Supp. 2d at 1365. Nor does the court's review of a separate issue with similar factors obviate the agency's duty to support its conclusions on separate claims with substantial evidence. *Matsushita Elec. Indus. Co.*, 750 F.2d at 933. Therefore, the Commission must separately discuss the pricing data in the context of a cumulation analysis on remand.

The Commission also relies on inadequate evidence in support of its analysis. First, the Commission notes that while the subject producers operate near maximum capacity, the United Kingdom producers' available capacity constitutes "more than ten-fold" the number of subject bearings they shipped to the United States in 2005. *Second Remand Determination* at 45. The agency implicitly assumes that the subject United Kingdom producers would ship all excess capacity to the United States in the absence of the order, but it does not provide evidence for its assumption. *Second Remand Determination* at 45 & n.171. The agency might have based its assumption on the price attractiveness of the domestic market, but that would have been in error if, as seems to be the case, the Commission relied on conclusions reached in the court's review of a different issue, as explained in the previous paragraph. If, on the other hand, the Commission

used the subject producers' presence in the domestic market and their export orientation as support for its finding, that reliance also fails for the reasons explained below. Either way, the Commission failed to provide substantial evidence to support its conclusion.

The Commission fails to explain rationally how United Kingdom ball bearings would compete with domestic ball bearings and non-subject imports in the absence of the order and, thus, likely reach the requisite level of impact.[15] First, the agency reasonably notes the fungibility between the domestic, United Kingdom, and non-subject ball bearings. *Id.* at 43. Second, as additional proof that the United Kingdom imports would compete aggressively on price, the Commission claims that those imports "have maintained a consistent and stable presence in the market during the first and second period of review, shipping between $8.2 million and $17.2 million worth of bearings to the United States during both periods." *Id*. (citing *See Certain Bearings from China, France, Germany, Italy, Japan, Singapore, and the United Kingdom: Investigation Nos. 731-TA-344, 391-A, 392-A and C, 393-A, 394-A, 396, and 399-A (Second Review)*, USITC Pub. 3876 (Aug. 2006) ("*Staff Report*") at Table BB-I-1). The court questions the reasonableness of the Commission's statement, especially given that the agency fails to

---

[15] The Commission cites to certain price comparison data to show that United Kingdom imports would be able to compete more aggressively on price with the domestic and non-subject imports to obtain market share in the absence of the order. *Second Remand Determination* at 49-52. The agency relies on this data despite the court's explicit statements in *NSK I* that it could "discern no meaningful trend from this information" and that the Commission based its conclusions on "a deficient sample." 32 CIT at ___, 577 F. Supp. 2d at 1347; *see also Second Remand Determination* at 49 n.184 ("As the Court correctly pointed out in *NSK I*, the Commission . . . had price comparison data for the U.K. imports for [only] *one of the ten* price comparison products reviewed in the Commission's report in the sunset review.") (emphasis added) (citation omitted). The court declined to find that the pricing data supplied the requisite rational basis to support the agency's findings in *NSK I*, and the Commission does not convince the court to decide otherwise in its review of the second remand determination.

account for the dramatic fluctuation and strong downward trend in the value of the subject United Kingdom ball bearings sold in the United States since the first period of review. *Staff Report* at Table BB-I-1. The significant downward change in the subject imports' market share in terms of value since the first period of review – between 20% and 40% – also undercuts the Commission's rationale that the subject United Kingdom imports maintained a stable presence in the domestic market and, thus, would compete on price with domestic ball bearings and non-subject imports. *Second Remand Determination* at 43 n.162. The Commission also suggests that because the United Kingdom producers sold the subject imports in most end-use sectors and major sales channels of the domestic market, they likely will compete more aggressively on price. *Id.* at 44. The court is not persuaded. Presence alone in numerous channels of the United States market does not prove that, in the absence of the order, the subject goods likely would compete with domestic ball bearings and non-subject imports in the domestic market or that the subject producers likely would use those channels. The same gap in logic plagues the Commission's reliance on the export-oriented character of the United Kingdom industry as additional proof that the subject goods likely would compete on price. Orientation alone does not demonstrate a likelihood of competition, and the Commission's reliance on such evidence, together with its other points, does not raise the agency's justification to the requisite rational connection needed for the court to sustain the finding.

     Finally, the Commission does not support with substantial evidence its conclusion that the United Kingdom industry likely would export an additional discernible amount of its products to the United States upon revocation, especially in view of the subject industry's

Consol. Court No. 06-00334                                                                          Page 15

increased focus "on products of 'particular interest' to the European market." *Id.* at 44 n.166, 47 n.178. The agency bases its conclusion on record evidence that purportedly shows that "U.K. imports retain a stable presence in the U.S. market and are sold in most of the end use sectors of the market." *Id.* at 44 n.166 (citing *Staff Report* at Table BB-I-10). The agency does not support with substantial evidence its conclusions on the United Kingdom's market share and presence in the United States market for reasons previously explained, and its reliance on the same evidence does not cure its conclusion on this point. The agency subsequently supplies a laundry-list of other evidence to purportedly justify its conclusion. First, the agency points to similarities in the United Kingdom and domestic industries' sales to the automotive and customs bearings market. *Second Remand Determination* at 44 n.166. That the two industries may sell to similar subsections of their respective markets does not necessarily demonstrate that United Kingdom producers likely would shift their focus from Europe to the United States. The court cannot discern, without more, the rational connection between the record evidence and the agency's conclusion on this point. Second, the Commission also relies on certain evidence from the three largest producers in the United Kingdom to support its finding: the producer with the greatest amount of excess capacity in 2005 continued to ship the subject merchandise to the United States during the period of review and another had excess capacity that "could" enable it to do so in the future, though the agency agreed that the third company was not likely to "take advantage of revocation" of the order. *Id.* at 47 n.178 (citing *Staff Report* at Table BB-IV-3). The agency again presumes, without a rational basis and relying on impermissible conjecture, that the United Kingdom producers would divert all excess capacity to the United States market, and the

Consol. Court No. 06-00334                                                                                    Page 16

Commission's use of the term "could" denotes mere possibility, rather than the requisite probability needed to satisfy the likely standard. The evidence offered by the Commission does not rise above a speculative level and, therefore, does not show that the subject United Kingdom imports (1) are more likely than not to focus on the United States market and (2) likely will have a discernible adverse impact on the domestic industry.

In sum, the court finds that the Commission supports its vulnerability finding with substantial evidence. However, as to the remainder of its cumulation analysis, the Commission does not support with substantial evidence its conclusion that the subject imports from the United Kingdom likely would have a discernible adverse impact in the absence of the antidumping duty order. More specifically, the Commission fails to provide the requisite rational connection which demonstrates some incentive likely would draw a discernible amount of the subject goods specifically to the United States market in the absence of the order. *See Nippon Steel*, 494 F.3d at 1379; *Cogne*, 29 CIT at 1173; *Usinor*, 27 CIT at 1403. The court does not believe that the existing record, taken as a whole, can support an affirmative discernible adverse impact finding. The Commission may reopen the record and obtain additional data on this issue in the next remand proceeding, if it so chooses.

**B. Additional Issues: The Likely Impact of Subject Imports on the Domestic Industry & The Causation Inquiry**

The Commission completes its redetermination of the likely impact and causation issues under the assumption that it properly cumulated ball bearings from the United Kingdom with other subject imports. *Second Remand Determination* at 64-83. The question of likely impact

asks the agency to answer whether the cumulated subject imports likely will have a significant adverse impact on the vulnerable domestic industry in the absence of the antidumping duty orders.  The causation inquiry requires the Commission to determine whether the cumulated subject imports constitute more than a minimal or tangential cause of injury to the domestic industry which will likely continue or recur in the absence of the antidumping duty orders.  In completing this task, the facts of this case necessitate that the Commission confirm that subject imports likely will reach the requisite level of causation despite the significant presence of, and seemingly impenetrable barrier imposed by, non-subject imports in the United States market.  Non-subject imports have "become a significant and price-competitive factor" in the United States ball bearings market, amply increased their market share in terms of value at the expense of domestic and subject ball bearings, and have undersold the domestic like product and subject imports in at least two-thirds of the possible price comparisons.  *Id.* at 69-70.  In view of this data, the non-subject imports may prevent the subject imports from achieving the requisite level of causation and, therefore, serve as an impenetrable barrier that precludes the agency from affirmatively finding injury in this sunset review.  The Commission should address this information as part of the causation inquiry.  However, because the court finds that the agency did not support its cumulation determination with substantial evidence, it cannot address the merits of these remaining issues.

      The court appreciates the Commission's continued vigor in resolving these issues and the diligence with which it has addressed these difficult questions thus far.  Indeed, assuming that the agency had correctly cumulated the subject imports, the Commission's analysis of the two

remaining issues nearly resembles the kind of substantial evidence needed for the court to sustain an agency determination. When it addresses these two issues on remand, the Commission should avoid the use of deficient price comparison data and certain conclusions that the court found unsupported by substantial evidence in the agency's cumulation analysis of the *Second Remand Determination*. *See, e.g.*, *id.* at 72, 74, 77.

### III.  Conclusion

For the foregoing reasons, it is

**ORDERED** that the court **SUSTAINS** in part and **REMANDS** in part the Commission's *Second Remand Determination* for further proceedings consistent with this opinion. Specifically, it is

**ORDERED** that, with respect to the cumulation analysis, the court **SUSTAINS** the Commission's conclusion that the domestic industry is in a weakened and, therefore, a vulnerable condition. However, the court **REMANDS** the discernible adverse impact analysis to the agency. In the third remand determination, the Commission must demonstrate that some incentive likely would draw a discernible amount of the subject United Kingdom goods specifically to the United States market in the absence of the order. Because the court does not believe the existing record, taken as a whole, can support an affirmative discernible adverse impact finding, the Commission may reopen the record and obtain additional data on the issue; it is further

**ORDERED** that the Commission must decide whether the cumulated subject imports likely will have a significant adverse impact on the vulnerable domestic industry in the absence of the antidumping duty orders; it is further

**ORDERED** that the Commission must determine whether the cumulated subject imports constitute more than a minimal or tangential cause of injury to the domestic industry that will likely continue or recur in the absence of the antidumping duty orders, given the significant presence of, and seemingly impenetrable barrier imposed by, non-subject imports in the United States market; it is further

**ORDERED** that, in completing its analysis of the causation and likely impact inquires on remand, the Commission must address the court's concerns expressed in *NSK III* over the agency's redetermination of those issues; and it is further

**ORDERED** that the Commission shall provide a status report to the court within 30 days from the date of this opinion that explains whether the agency will re-open the record on the cumulation issue.  The parties shall also file a joint scheduling order consistent with Court and Chambers rules at that time.


Dated:   April 12, 2010                                                                    /s/ Judith M. Barzilay
            New York, New York                                                         Judith M. Barzilay, Judge

# NOTICE OF ENTRY AND SERVICE

   This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

   Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

   Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.


                                          Tina Potuto Kimble
                                          Clerk of the Court



Date: _____     By: _____
                                          Deputy Clerk